IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GREAT LAKES DREDGE & DOCK COMPANY, LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>PHILLY SHIPYARD, INC.,<br><br>*Defendant*. | Case No.: 2:24-6198 |

## COMPLAINT

Plaintiff Great Lakes Dredge & Dock Company, LLC ("Great Lakes") files this Complaint against Defendant Philly Shipyard, Inc. ("Philly") to obtain equitable and injunctive relief because Philly's project delays and violations of the Vessel Construction Agreement dated November 15, 2021, as amended (the "VCA") threaten to irreparably harm Great Lakes.

## THE PARTIES

1. Great Lakes is a limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business at 9811 Katy Freeway, Suite 1200, Houston, Texas 77024. Great Lakes has a single member, Great Lakes Dredge & Dock Corporation, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 9811 Katy Freeway, Suite 1200, Houston, Texas 77024.

2. Philly is a corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 2100 Kitty Hawk Avenue, Philadelphia, PA 19112.

1

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000.00 and complete diversity of citizenship exists between the parties.

4. This Court has general personal jurisdiction over Philly because it is a Pennsylvania corporation.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Philly resides in this district and a substantial part of the events or omissions giving rise to Great Lakes's claims occurred in this district.

**NATURE OF THIS ACTION**

I. **Great Lakes and Philly entered the VCA following a competitive bidding process that emphasized the timely construction of the Vessel.**

6. Great Lakes is the leading provider of dredging services (*i.e.*, the removal of sediment and other materials from the bottom of bodies of water) in the United States, specializing in projects that help improve and protect our nation's infrastructure and coastlines.

7. Philly is a shipbuilder that constructs commercial and government vessels.

8. Great Lakes recently identified an opportunity in the rapidly developing United States offshore wind market. To take advantage of that opportunity, Great Lakes determined to invest in the build of the first United States-flagged, Jones Act-compliant subsea rock installation vessel for wind turbine foundations (the "Vessel").

9. The Vessel is an essential step toward building the marine infrastructure required for the new domestic offshore wind industry, which will play a crucial role in helping the United States meet its decarbonization and renewable energy goals. But time is of the essence for Great Lakes as a first mover in the market.

10. So, Great Lakes initiated an extensive competitive bid process for the construction of the Vessel and invited multiple shipyards to participate.

11. The bid package included a basic design by Ulstein Design & Solutions B.V., a world-renown ship design engineer, and specifications for the Vessel, together with a draft VCA.

12. Philly is one of the shipyards that participated in the competitive bid process.

13. Based on questionnaire responses and other considerations, Great Lakes reduced the number of shipyards participating in the competitive bid process to a select few.

14. Throughout the competitive bid process, Great Lakes emphasized that time was of the essence for the Vessel's completion.

15. Building and timely delivering a ship like the Vessel is an involved process that requires a shipbuilder manage and coordinate multiple deliverables, such as placing purchase orders with suppliers, obtaining detailed design drawings from a design subcontractor, and having the necessary specialized labor, heavy machinery, and materials available at the dock at the appropriate times.

16. To effectively manage the timely delivery of a ship like the Vessel, the shipbuilder must create and maintain a schedule that is fully resource loaded (*i.e.*, that provides resource allocation for each task) and logic linked (*i.e.*, that sequences activities in a manner that ensures prerequisite activities occur before successor activities). For example, before welding a hull can occur, the steel must be delivered, the skilled labor must be present, and the dock space must be available.

17. Initially, Philly proposed a schedule for the Vessel that did not meet Great Lakes's requirements, and so it effectively withdrew itself from consideration.

18. However, Philly later reinserted itself into the competitive bid process, providing and committing to a new schedule that met Great Lakes's requirements. With Philly's commitment that it could complete and deliver the Vessel on an acceptable timeline, Great Lakes hired Philly to construct the Vessel.

19. On or about November 15, 2021, Great Lakes and Philly executed the VCA.

20. The diligence required to construct and timely deliver a ship like the Vessel, briefly described above, is why shipyards are paid well. Philly agreed to undertake a duty of diligence for the Vessel, and in turn Great Lakes agreed to pay Philly hundreds of millions of dollars.

21. Specifically, Section 9.4 of the VCA outlines the "Builder's Duty of Diligence," which requires Philly to (1) "prosecute the Work diligently to ensure its completion in full accordance with the Contract Documents within the time required for delivery of the Vessel by the Delivery Date"; (2) "furnish sufficient numbers or amounts of properly skilled and qualified workers, acceptable Materials and equipment and adequate services and tools and equipment necessary for the Work and the delivery of the Vessel by the Delivery Date"; and (3) to "Prioritize Completion" by "not tak[ing] or fail[ing] to take any action based on an assumption that the payment of liquidated damages would be more economically advantageous for Builder than the cost of allocating necessary available resources to the construction of the Vessel that, if so allocated, would prevent or lessen any delay in the delivery of the Vessel."

22. Also baked into the price Philly is paid is that time is of the essence. Section 9.3 of the VCA states: "Time is of the Essence. Builder [Philly] expressly understands that time is of the essence for Owner [Great Lakes] and that an essential basis of consideration for this Agreement and a fundamental reason why Builder's proposal has been selected and that Owner has entered into this Agreement with Builder is the representation by Builder and the commitment made by

4

Builder in this Agreement that, except for Permissible Delays excused in accordance with the terms of this Agreement, Builder can and will perform the Work and can and will deliver the Vessel by the Delivery Date."

23. Indeed, the VCA is replete with provisions indicating the importance of timely delivery. *E.g.*, VCA §§ 1.8, 2.5(a), 3.4(d), 3.4(e) 8.1, 8.2, 8.3, 8.4, 8.5, 8.6, 8.9, 8.10, 8.11, 8.13, 8.14, 9.4, 13.5, 16.1, 16.2, 16.3, 16.4, 16.6, 16.7, 16.15, 17.1, 17.2, 17.3, 17.4, 17.5, 17.6, 17.7.

24. Further, in the VCA Philly "acknowledge[d] and agree[d] that a breach by Builder of its obligations" regarding Philly's duty of diligence "would present irreparable harm to Owner and Owner shall have the right to seek equitable relief, including an injunction, to prevent or rectify any such breach by Builder." VCA § 9.4(d).

25. Section 9.4(d) of the VCA simply reflects reality: Great Lakes would suffer irreparable harm if the Vessel were not timely delivered, including but not limited to (1) reputational damage in the marketplace; (2) Great Lakes's inability to meet its own obligations to customers in downstream contracts that were entered into in reliance on the timely delivery of the Vessel; and (3) reputational damage with stakeholders.

26. Given this potential for irreparable harm, the VCA protects Great Lakes's right to seek that equitable and injunctive relief in this Court. Section 27.12 provides that nothing "shall be deemed to limit or otherwise restrict the right of either Party to seek injunctive or other equitable relief in any court of competent jurisdiction."

27. The original delivery date for the Vessel was November 15, 2024, VCA § 1.8, which can be extended by change orders via a process set forth in VCA Article 10.

28. When a change order is accepted, this process essentially updates the VCA with a formal modification that details any impacts to the scope of work, cost, and schedule.

29. To date, Great Lakes has accepted two change orders with schedule impacts, and the contractual delivery date is now February 14, 2025.

30. In other attempts to extend the delivery date by means not supported by the VCA (and, in Great Lakes's view, due in part to Philly prioritizing work on other ships for other customers), Philly throughout the project submitted several meritless force majeure claims, all of which Great Lakes rejected under the VCA's terms.

31. And to obscure the status of its progress, Philly has consistently failed to maintain a fully resource-loaded, logic-linked schedule, in breach of its obligations under VCA Article 8.

32. Notwithstanding these and other repeated failures to perform, Great Lakes, despite its frustrations, made every effort to reach commercial resolutions with Philly.

II. **Philly has breached the VCA and threatens to irreparably harm Great Lakes by failing to maintain a project schedule that will result in completion by the delivery date, diverting resources to other projects, and threatening to float the Vessel.**

33. But Great Lakes's patience has reached its end, because it recently became apparent that Philly's pattern of false promises, failure to take seriously its contractual commitments, and breaches of the VCA threatened to irreparably harm Great Lakes. For example, Philly's schedules are now showing delivery dates as late as September 30, 2026, ***593 days*** past the February 14, 2025, delivery date.

34. If allowed, these delays would irreparably harm Great Lakes through reputational damage in the marketplace, Great Lakes's inability to meet its own obligations to customers in 2025 and 2026 that were assumed on the premise that Philly would timely deliver the Vessel, and reputational damage with stakeholders. *See, e.g.*, VCA § 9.4(d).

35. And the projected delays have recently accelerated at an alarming rate. For example, on or about May 15, 2024, Philly proposed an "August 2025 Delivery," *i.e.*, more than half a year late.

36. Then, on or about August 26, 2024, Philly "show[ed] a delivery date of October 30, 2025," or two more months of delay.

37. And on or about October 5, 2024, Philly stated that it "estimated [a] delivery date of September 30, 2026."

38. In other words, although less than five months passed from May to October, Philly pushed out its estimated delivery date by *more than a year*.

39. Philly's delays are exacerbated by its prioritization of other projects at the shipyard at the expense of making progress on the Vessel. For example, Philly has assigned only one individual exclusively dedicated to the construction of the Vessel. All of Philly's other labor resources are shared between projects, and those shared resources have, in Great Lakes's view, been diverted to other customers who have placed orders for a series of ships with Philly (as opposed to Great Lakes's one-off Vessel), at the expense of progress on the Vessel.

40. Not only is Philly shifting labor from the Vessel to other projects, but it is also laying off labor that is needed for the Vessel. For example, on or about October 17, 2024, Philly disclosed to Great Lakes that it long ago laid off certain specialist outfitting workers required for the outfitting of certain components of the Vessel, which resulted in a workforce deficiency.

41. Underscoring the delay caused by Philly failing to devote adequate manpower to the Vessel, a substantial amount of the expected outfitting material for the Vessel has been delivered, but only a minimal amount of that material is being worked on. The remaining majority of material is simply sitting at the dock and not being put to productive use due to Philly diverting shared resources to other ships for other customers and otherwise failing to hire and devote sufficient manpower to the construction of the Vessel.

42. By way of final, non-exhaustive example, Philly recently notified Great Lakes of its intent to remove the Vessel from its position in the dock and float it into the harbor. Given the state of the Vessel (*i.e.*, not near completion), this is no light task and Philly's proposal comes with multiple issues that portend further delay.

43. First, the "float" proposal comes with the likelihood of significant delay and appears to be a way for Philly to progress its work with other customers that it prefers at the expense of the Vessel. The Vessel in its current state cannot be removed from the dock and floated into the harbor.

44. The Vessel is not designed to be floated at its current stage of construction and so, at a minimum, it would need to be waterproofed, which would take additional resources and manpower that are not reflected in the project's current schedule.

45. And, conveniently for Philly, the "float" strategy that it proposes would accelerate its other projects for other customers who have placed orders with Philly for a series of ships. This would allow Philly to further divert shared labor resources from the Vessel to other customers, an issue that Great Lakes has already experienced.

46. Specifically, the Vessel is currently located in the building dock at the shipyard, positioned ahead of a ship that is one of a series of ships ordered by one of Philly's government clients. Philly proposes to "float" the Vessel into the harbor so that the ship behind the Vessel can be moved ahead of the Vessel and to the outfitting dock. This would enable Philly to further divert labor resources from building the Vessel to outfitting a ship for another client.

47. Before returning the Vessel to the building dock, Philly then proposes to place another ship that is one of a series of ships ordered by the same government client in the building

dock behind the Vessel, again enabling Philly to further divert labor resources from building the Vessel to building a ship for another client.

48. Tellingly, the "float" strategy that Philly proposes would also accelerate when it can begin building another ship for a commercial customer who ordered a series of ships.

49. Philly has pitched the "float" strategy to Great Lakes under the guise of "reduc[ing] the estimated delivery durations," but Philly has not provided a fully resource-loaded, logic-linked schedule that would support the project gains that Philly promises would result, as is required under VCA §§ 8.2 through 8.6. This only heightens the likelihood of significant delay.

50. Second, Philly's proposed "float" strategy would breach the VCA. Great Lakes has not consented to Philly's "float" plan, as required by VCA § 8.7, and Great Lakes has explicitly objected to the "float" plan multiple times. Philly recently informed Great Lakes that it plans to proceed despite Great Lakes's objection, and that it has taken the affirmative step of not welding Grand Block 14 to the hull of the Vessel and instead lifting it out of the building dock in furtherance of its contested "float" plan.

51. Third, removing the Vessel from its position in the dock at this stage of construction puts the Vessel at risk of being damaged. The Vessel is not designed to be waterproofed or floated at this stage of construction. Changing the design and taking actions to waterproof the Vessel at this stage could permanently damage it. Too, the original agreed build strategy does not contemplate moving the Vessel at this stage of construction from the dock, where it is safe, to the harbor. Moving the Vessel from the dock to the harbor and from the harbor to the dock puts the Vessel at risk of being damaged while in transit. Finally, the Vessel could be damaged while floated in the harbor, including a risk of total loss. These risks are not present when the Vessel is in its

position in the dock, and the Vessel being damaged or completely lost would cause Great Lakes irreparable harm.

## COUNT I: BREACH OF CONTRACT

52. Great Lakes incorporates the preceding paragraphs as if fully set forth herein.

53. Great Lakes and Philly are parties to the VCA.

54. The VCA is a valid and enforceable contract.

55. Great Lakes has materially performed its commitments under the VCA. To date, Great Lakes has paid Philly approximately 64% of the price under the VCA pursuant to agreed-upon milestone payments.

56. Great Lakes is ready, willing, and able to perform its remaining contractual obligations, including paying the remainder of the price under the VCA pursuant to the agreed-upon milestone payments. *See id.*

57. Philly has breached its obligations under the VCA, including but not limited to:

   a. VCA § 1.8 as amended requires Philly to deliver the Vessel no later than February 14, 2025, and Philly is currently forecasting delivery as late as September 30, 2026.

   b. VCA § 9.4 imposes on Philly a duty of diligence. Philly has breached its duty of diligence by, among other things, failing to prosecute the work under the VCA diligently to ensure the Vessel's completion by the contractual delivery date, by diverting resources from the Vessel to other projects in the shipyard, by laying off specialized labor necessary to complete the Vessel, and by refusing to undertake costs to make up for lost time (such as costs to have certain materials delivered by air rather than by boat) unless Great Lakes contributes "acceleration costs."

      c.      VCA §§ 8.2 through 8.6 require Philly to create and maintain an updated project schedule that is fully resource loaded and logic linked that shows delivery of the Vessel by the contractual delivery date. Philly has failed to maintain a fully resource-loaded and logic-linked schedule throughout construction and has failed to produce a fully resource-loaded and logic-linked schedule to support the schedule gains that Philly promises would result from its purported "float" strategy.

      d.      VCA § 8.7 requires that Philly obtain Great Lakes's approval to modify the build strategy for the Vessel, but Philly has informed Great Lakes of its intention to float the Vessel and significantly alter the construction plan without Great Lakes's approval and over Great Lakes's strong objection.

      e.      VCA § 8.13(d) requires Philly to take "actions as are reasonably practicable to ensure that the Vessel be completed by the Delivery Date," including "adding additional shifts or engaging additional workers or Subcontractors as necessary to ensure the Work is completed in such time." Philly instead has refused to undertake costs to recover lost time in construction (such as costs to have certain materials delivered by air rather than by boat, among others) unless Great Lakes contributes "acceleration costs," has diverted resources from the Vessel to other projects in the shipyard, and has laid off specialized labor necessary to complete the Vessel.

58.    Therefore, violations of Great Lakes's contractual rights are both presently occurring and are threatened and imminent.

59.    Great Lakes has been damaged by Philly's breaches of contract. Philly's breaches of contract now also threaten to irreparably harm Great Lakes through at least (1) reputational damage in the marketplace; (2) Great Lakes's inability to meet its own obligations to customers in

2025 and 2026 that were assumed on the premise that Philly would timely deliver the Vessel; and (3) reputational damage with stakeholders.

60. Further, in VCA § 9.4(d), Philly acknowledged and agreed that a breach of its duty of diligence "would present irreparable harm to Owner and Owner shall have the right to seek equitable relief, including an injunction, to prevent or rectify any such breach by Builder."

61. In § 9.3 of the VCA, Philly acknowledged that it "expressly understands that time is of the essence for Owner and that an essential basis of consideration for this Agreement and a fundamental reason why Builder's proposal has been selected."

62. There are no adequate remedies at law because monetary damages alone are inadequate to fully compensate Great Lakes for the irreparable harm threatened by Philly's breaches of the VCA. For example, money cannot restore Great Lakes's reputation in the marketplace, restore Great Lakes's standing with customers if Great Lakes is unable to meet its obligations in 2025 and 2026, nor restore Great Lakes's reputation and standing with its stakeholders.

63. A balance of equities favor the Court providing Great Lakes with injunctive and equitable relief, because Philly is contractually obligated to carry out its duty of diligence and complete the Vessel by the delivery date, and completion of the Vessel is an essential step toward building the marine infrastructure required for the new offshore domestic wind industry, which will play a crucial role in helping the United States meet its decarbonization and renewable energy goals.

64. Philly can perform its contractual obligations. For example, throughout the competitive bid process, Philly represented that it could and would deliver the Vessel by the

contractual delivery date. Philly represented at VCA § 9.3 that it could timely deliver the Vessel. Philly has also represented throughout the project that it can and would timely deliver the Vessel.

65. Philly is choosing not to perform its contractual obligations. For example, Philly has diverted labor to other projects in the shipyard at the expense of progress on the Vessel, refused to undertake methods to improve progress on the schedule unless Great Lakes pays "acceleration costs," and has laid off specialized labor required for the Vessel.

**RELIEF REQUESTED**

WHEREFORE, Great Lakes respectfully requests that the Court enter judgment in its favor against Philly as follows:

A. Entering a temporary restraining order, preliminary injunction, and permanent injunction enjoining Philly from removing the Vessel from its position in the dock and floating it into the harbor until the Vessel is ready to be outfitted, pursuant to the schedule to be provided per Paragraph (C)(1), below;

B. Entering a preliminary and permanent injunction enjoining Philly from diverting shared resources from the Vessel to other projects in the shipyard;

C. Entering a preliminary and permanent injunction requiring Philly to (1) develop and maintain a fully resource-loaded and logic-linked schedule pursuant to VCA Article 8; and (2) comply with its duty of diligence pursuant to VCA Article 9, including putting the necessary resources to the construction of the Vessel to achieve timely delivery, placing all purchase orders required under the VCA within sixty days, and pay for materials to be shipped by air to catch up on the delivery date;

D. Entering an order granting specific performance;

E. Awarding Great Lakes its attorneys' fees, costs, and disbursements in prosecuting this action to the extent permitted by the VCA or in equity; and

F. Granting such other, further relief as the Court deems just and proper.[1]

Date: November 19, 2024

Respectfully submitted,

/s/ *Wesley A. Prichard*
Thomas E. Birsic, Esq.
Pa. ID No. 31092
thomas.birsic@klgates.com
Wesley A. Prichard, Esq.
Pa. ID No. 324411
wesley.prichard@klgates.com
Falco A. Muscante II, Esq.
Pa. ID No. 333759
falco.muscanteii@klgates.com
**K&L GATES LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500

Rusty Hardin, Esq.
(*pro hac vice pending*)
rhardin@rustyhardin.com
Terry D. Kernell, Esq.
(*pro hac vice pending*)
tkernell@rustyhardin.com
Emily Smith, Esq.
(*pro hac vice pending*)
esmith@rustyhardin.com
**RUSTY HARDIN & ASSOCIATES, LLP**
1401 McKinney, Suite 2250
Houston, Texas 77010
(713) 652-9000

*Counsel for Plaintiff Great Lakes Dredge & Dock Company, LLC*

---

[1] Great Lakes does not seek recovery of damages in this action, but it reserves its right to seek damages for Philly's breaches of the VCA consistent with VCA Article 27. *See* VCA § 27.12

14