**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREAT LAKES DREDGE & DOCK COMPANY, LLC, <br><br> *Plaintiff,* <br><br> vs. <br><br> PHILLY SHIPYARD, INC., <br><br> *Defendant.* | Case No.: 2:24-cv-06198 |

**GREAT LAKES DREDGE & DOCK COMPANY, LLC'S
BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Great Lakes Dredge & Dock Company, LLC ("Great Lakes") requires immediate injunctive relief because Philly Shipyard, Inc.'s ("Philly's") continuing and threatened additional breaches of contract present irreparable harm. Most pressing, Philly recently announced its decision—over Great Lakes's objection—to move a ship that Great Lakes hired Philly to construct from its position in the dock at an early stage of completion and to float it into the harbor, which could result in irreparable physical damage to the ship up to total loss. Great Lakes therefore requests a temporary restraining order enjoining Philly from moving the ship from its position in the dock and from taking any action to prepare to move the ship.

Additionally, Philly's delays in constructing the ship and breaches of its duty of diligence present imminent irreparable harm, as Philly is now projecting to deliver it ***593 days late***, which would irreparably harm Great Lakes's reputation with customers and investors and would threaten to rob Great Lakes of the benefits of being a first mover in the marketplace. Great Lakes therefore requests a preliminary injunction that that holds Philly to its contractual obligations.

**FACTUAL BACKGROUND**

I.      <u>Great Lakes and Philly entered the VCA following a competitive bidding process that emphasized the timely construction of the Vessel.</u>

To take advantage of an opportunity in the rapidly developing United States offshore wind market, Great Lakes determined to invest in the build of the first United States-flagged, Jones Act-compliant subsea rock installation vessel for wind turbine foundations (the "Vessel"). Ex. 1, C. Gunsten Declaration at ¶¶ 5–6. But time is of the essence for Great Lakes as the first mover in the market. *Id.* at ¶ 7. So, Great Lakes initiated an extensive competitive bid process for the construction of the Vessel. *Id.* at ¶ 8. Throughout that process, Great Lakes emphasized to bidders that time was of the essence. *Id.* at ¶ 10.

To effectively manage the timely delivery of a ship like the Vessel, the shipbuilder must create and maintain a schedule that is fully resource loaded and logic linked. *See* Ex. 2, VCA at §§ 8.1–8.6. A resource-loaded schedule is one that accounts for and allocates specific resources to specific tasks, *e.g.*, ensuring that skilled labor is hired to perform welding. And a logic-linked schedule is one that sequences activities in a manner that ensures prerequisite activities occur before successor activities, *e.g.*, ordering the steel with enough lead time so that it is delivered before welding is set to begin.

Philly, one of the participants in the competitive bid process, initially proposed a schedule for the Vessel that did not meet Great Lakes's requirements and effectively withdrew itself from consideration. Ex. 1, C. Gunsten Declaration at ¶¶ 9, 12. However, Philly later reinserted itself into the competitive bid process, providing and committing to a new schedule that met Great Lakes's requirements. *Id.* at ¶ 13. With Philly's commitment that it could complete and deliver the Vessel on an acceptable timeline, after narrowing the potential bidders, Great Lakes hired Philly to construct the Vessel. *Id.* at ¶ 14.

On or about November 15, 2021, Great Lakes and Philly executed the Vessel Construction

Agreement for the Vessel (the "VCA"). Ex. 2, VCA. In the VCA, Philly recognized that time is of

the essence:

> Builder [Philly] expressly understands that time is of the essence for
> Owner [Great Lakes] and that an essential basis of consideration for
> this Agreement and a fundamental reason why Builder's proposal
> has been selected and that Owner has entered into this Agreement
> with Builder is the representation by Builder and the commitment
> made by Builder in this Agreement that, except for Permissible
> Delays excused in accordance with the terms of this Agreement,
> Builder can and will perform the Work and can and will deliver the
> Vessel by the Delivery Date.

*Id.* at § 9.3.

Given that time is of the essence, Philly agreed to undertake a duty of diligence for the

Vessel, and in turn Great Lakes agreed to pay Philly hundreds of millions of dollars. Section 9.4

of the VCA outlines the "Builder's Duty of Diligence," which requires Philly to (1) "prosecute the

Work diligently to ensure its completion in full accordance with the Contract Documents within

the time required for delivery of the Vessel by the Delivery Date"; (2) "furnish sufficient numbers

or amounts of properly skilled and qualified workers, acceptable Materials and equipment and

adequate services and tools and equipment necessary for the Work and the delivery of the Vessel

by the Delivery Date"; and (3) to "Prioritize Completion" by "not tak[ing] or fail[ing] to take any

action based on an assumption that the payment of liquidated damages would be more

economically advantageous for Builder than the cost of allocating necessary available resources

to the construction of the Vessel that, if so allocated, would prevent or lessen any delay in the

delivery of the Vessel." *Id.* at §§ 9.4(a)–(c). And Philly "acknowledge[d] and agree[d] that a breach

by Builder of its obligations" regarding Philly's duty of diligence "would present irreparable harm

to Owner and Owner shall have the right to seek equitable relief, including an injunction, to prevent or rectify any such breach by Builder." *Id.* at § 9.4(d).

Under the VCA, as amended, Philly's delivery date for the Vessel is February 14, 2025. Ex. 3, VCA Amendment No. 2.

**II.     <u>Philly has breached the VCA and threatens to irreparably harm Great Lakes.</u>**

Recently, it became apparent that Philly's pattern of false promises, failure to take seriously its contractual commitments, and breaches of the VCA threaten to irreparably harm Great Lakes through twenty months of projected delay, de-prioritization of constructing the Vessel, and a brazen decision to place the Vessel at risk of irreparable physical damage or total loss by floating it into the harbor at an early stage of construction, over Great Lakes's objection.

**Breach of VCA § 8.7: Modifying the build strategy without consent.** Philly recently notified Great Lakes of its intent to remove the Vessel from its position in the dock and float it into the harbor, over Great Lakes's objection, and that Philly took affirmative steps in furtherance of its contested "float" plan. Ex. 1, C. Gunsten Declaration at ¶¶ 30–32. Given the state of the Vessel (*i.e.*, not near completion), this is no light task and Philly's proposal comes with multiple issues that portend further delay.

*First*, Philly's "float" strategy would breach the VCA. Great Lakes has not consented to Philly's "float" plan, as required by VCA § 8.7, and Great Lakes has explicitly objected to the "float" plan multiple times. *Id.* at ¶ 31; *see also* Ex. 4, Sept. 25, 2024, Ltr.; Ex. 5, Oct. 21, 2024, Ltr.; Ex. 6, Nov. 15, 2024, Ltr. Philly recently informed Great Lakes that it plans to proceed despite Great Lakes's objection, and that Philly chose to not weld Grand Block 14 to the hull of the Vessel, but instead lifted it out of the building dock in furtherance of its contested "float" plan. Ex. 1, C. Gunsten Declaration at ¶ 32.

***Second***, the "float" proposal comes with the likelihood of significant delay and appears to be a way for Philly to progress its work with other customers that it prefers at the expense of the Vessel. The Vessel in its current state cannot be and is not designed to be removed from the dock and floated into the harbor. At a minimum, it would need to be waterproofed, which would take additional resources and manpower that are not reflected in the project's current schedule. *Id.* at ¶¶ 33–36.

And, conveniently for Philly, the "float" strategy that it proposes would accelerate other projects for other customers who have placed orders with Philly for a series of ships. This would allow Philly to further divert shared labor resources from the Vessel to other customers, an issue that Great Lakes has already experienced. Specifically, the Vessel is currently located in the building dock at the shipyard, positioned ahead of a ship that is one of a series of ships ordered by one of Philly's government clients. *Id.* at ¶ 38. Philly proposes to float the Vessel into the harbor so that the ship behind the Vessel can be moved ahead of it and to the outfitting dock. *Id.* This would enable Philly to further divert labor resources from building the Vessel to outfitting a ship for another client. *Id.*

Before returning the Vessel to the building dock, Philly then proposes to further deprioritize the Vessel by placing another ship that is one of a series of ships ordered by the same government client in the building dock behind the Vessel, *id.* at ¶ 39, again enabling Philly to further divert labor resources from building the Vessel to building a ship for another client. Tellingly, the "float" strategy that Philly proposes would also accelerate when it can begin building yet another ship for a commercial customer who ordered a series of ships. *Id.* at ¶ 40.

Philly has pitched the "float" strategy to Great Lakes under the guise of reducing the estimated delivery durations, but Philly has not provided a fully resource-loaded, logic-linked

schedule that would support the project gains that Philly promises would result, as is required under VCA §§ 8.2–8.6. *Id.* at ¶ 41. This only heightens the likelihood of significant delay.

*Third*, removing the Vessel from its position in the dock at this stage of construction puts the Vessel at risk of being damaged. The Vessel is not designed to be waterproofed or floated at this stage of construction. *Id.* at ¶ 43. Changing the design and taking actions to waterproof the Vessel at this stage could permanently damage it. *Id.* Too, the original, agreed build strategy does not contemplate moving the Vessel at this stage of construction from the dock, where it is safest, to the harbor, where it is not. *Id.* at ¶ 44. Moving the Vessel from the dock to the harbor and from the harbor to the dock puts the Vessel at risk of being damaged while in transit. *Id.* Finally, the Vessel could be damaged while floated in the harbor, including a risk of total loss of the Vessel. *Id.* at ¶ 45. These risks are not present when the Vessel is in its position in the dock, and the Vessel being damaged or completely lost would cause Great Lakes irreparable harm. *Id.* at ¶¶ 46–47.

If the Vessel were physically damaged or destroyed by Philly's contested "float" plan, Great Lakes could lose the benefit of being the first mover in the market because many shipyards capable of building the Vessel are now overbooked, and prices to build ships are significantly higher now than when the VCA was entered. *Id.* at ¶ 65. Restarting construction on the Vessel would thus cause Great Lakes irreparable harm. *Id.*

**Breach of VCA § 1.18: Projecting to fail to timely deliver the Vessel.** Philly's schedules are now showing delivery dates as late as September 30, 2026, ***593 days*** past the February 14, 2025, delivery date. *Id.* at ¶ 17. And the projected delays have recently accelerated at an alarming rate. For example, on or about May 15, 2024, Philly proposed an August 2025 delivery, *i.e.*, more than half a year late. *Id.* at ¶ 20. Then, on or about August 26, 2024, Philly showed a delivery date of October 30, 2025, or two more months of delay. *Id.* at ¶ 21. And on or about October 5, 2024,

Philly stated that it estimated a delivery date of September 30, 2026. *Id.* at ¶ 22. In other words, although less than five months passed from May to October, Philly pushed out its estimated delivery date by ***more than a year***.

If Philly were to fail to timely deliver the Vessel, Great Lakes would suffer reputational damage and loss of goodwill with its investors, current and prospective customers, and in the marketplace. *Id.* at ¶¶ 18, 61, 63–64. In particular, Philly's failure to timely deliver the Vessel would prevent Great Lakes from meeting its own obligations to customers in 2025 and 2026 that were assumed on the premise that Philly would timely deliver the Vessel. *Id.* at ¶ 62. Further, Great Lakes cannot in good business conscience enter new contracts respecting the Vessel without knowing when the Vessel will be delivered. *Id.*

**Breach of VCA § 9.4: Failure to meet duty of diligence.** Philly's failure to meet its duty of diligence is exemplified by its projected failure to meet the contractual delivery date by *more than a year and a half*. Those delays are exacerbated by its prioritization of other projects at the shipyard at the expense of making progress on the Vessel. For example, Philly has assigned only one individual exclusively dedicated to the construction of the Vessel. *Id.* at ¶ 24. All of Philly's other labor resources are shared between projects, and those shared resources have, in Great Lakes's view, been diverted to other customers who have placed orders for a series of ships with Philly (as opposed to Great Lakes's one-off Vessel), at the expense of progress on the Vessel. *Id.* at ¶¶ 23, 25–26.

Not only is Philly shifting labor from the Vessel to other projects, but it is also laying off labor that is needed for the Vessel. For example, on or about October 17, 2024, Philly disclosed to Great Lakes that it long ago laid off certain specialist outfitting workers required for the outfitting of certain components of the Vessel, which resulted in a workforce deficiency. *Id.* at ¶ 27.

Underscoring the delay caused by Philly failing to devote adequate manpower to the Vessel, a substantial amount of the expected outfitting material for the Vessel has been delivered, but only a minimal amount of that material is being worked on. *Id.* at ¶ 29. The remaining majority of material is simply sitting at the dock and not being put to productive use due to Philly diverting shared resources to other ships for other customers and otherwise failing to hire and devote sufficient manpower to the construction of the Vessel. *Id.*

Through the VCA, Philly "acknowledge[d] and agree[d] that a breach" of "its obligations" regarding its duty of diligence "would present irreparable harm to" Great Lakes. Ex. 2, VCA at § 9.4(d).

**Breach of VCA §§ 8.2–8.6: Failure to create and maintain a project schedule.** Throughout the project, Philly has failed to develop and maintain a fully resource-loaded, logic-linked schedule, in violation of its obligations under VCA §§ 8.2–8.6. Great Lakes throughout the project has expressed to Philly its concern that Philly is working from an unacceptable schedule. Ex. 1, C. Gunsten Declaration at ¶¶ 50–51. But Philly to date has failed to develop even a baseline schedule that Philly believes is obtainable against which to evaluate its progress. *Id.* at ¶ 52. This prevents Great Lakes from being able to monitor progress on the project and prevents Philly from demonstrating its achievement of project milestones to earn further payments under the VCA. *Id.* at ¶ 53.

**Breach of VCA §§ 8.13(d), 9.4: Failure to take action to recover lost time.** Philly is doing nothing to make up for lost time, such as paying to ship certain materials by air rather than by boat or by upping the manpower devoted to constructing the Vessel to makes gains on the projected delivery date. *Id.* at ¶ 54. In fact, Philly has refused to undertake any such measures

unless Great Lakes contributes "acceleration costs." *Id.* at ¶ 55. This breaches Philly's duty of diligence and obligation to take actions to recover lost time. Ex. 2, VCA §§ 8.13(d), 9.4.

Notably, Philly is not charged liquidated damages for delay more than 105 days. *See id.* at §§ 17.2–17.7. Although it is economically motivated against taking measures that reduce delay beyond 105 days, Philly's duty of diligence explicitly requires that Philly prioritize the timely completion of the Vessel over such economic considerations. *Id.* at § 9.4(c).

ARGUMENT

## I.     <u>Great Lakes is entitled to immediate injunctive relief.</u>

Great Lakes seeks a temporary restraining order enjoining Philly from taking any action to remove the Vessel from its position in the dock and floating it into the harbor until the Vessel is ready to be outfitted according to the original, agreed-upon build strategy.

Great Lakes also seeks a preliminary injunction (1) enjoining Philly from taking any action to remove the Vessel from its position in the dock and floating it into the harbor until the Vessel is ready to be outfitted according to the original, agreed-upon build strategy; (2) enjoining Philly from diverting shared resources from the Vessel to other projects in the shipyard; and (3) requiring Philly to (a) develop and maintain a fully resource-loaded and logic-linked schedule consistent with VCA §§ 8.2–8.3; (b) comply with its duty of diligence, including putting the necessary resources to the construction of the Vessel to achieve timely delivery; and (c) comply with its duty to take actions to recover the project schedule, including placing all purchase orders required under the VCA within 60 days and paying for certain materials to be shipped by air.

Courts apply the same standard in assessing requests for interim injunctive relief, regardless of whether the movant requests a temporary restraining order or preliminary injunction. *See Wright v. Columbia Univ.*, 520 F. Supp. 789, 792–93 (E.D. Pa. 1981) (Troutman, J.) (applying

9

one standard to a motion for both a temporary restraining order and preliminary injunction).

A party is entitled to preliminary injunctive relief when it demonstrates: "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d. Cir. 2010) (internals omitted). "Once the moving party meets the threshold for the first two factors, the court must balance all four factors in deciding whether to grant a preliminary injunction." *Syzygy Integration LLC v. Harris*, 616 F. Supp. 3d 439, 443 (E.D. Pa. 2022) (Bartle, J.) (internals omitted).

Each factor weighs in favor of granting Great Lakes immediate injunctive relief.

## A. Great Lakes has made a *prima facie* showing that there is a reasonable probability that Philly breached the VCA.

**Great Lakes's burden.** Great Lakes "need not establish with certainty that" it "will succeed on the merits"; rather, Great Lakes need only "make a prima facie showing that" it "has a reasonable probability of succeeding on the merits." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chamberlain*, 145 F. Supp. 2d 621, 625 (M.D. Pa. 2001) (internals omitted). Great Lakes is "not required to prove that success is more likely than not," *Hilb Grp. of Md., LLC v. Smith*, No. 23-1978, 2024 WL 2216851, at *3 (M.D. Pa. May 15, 2024) (internals omitted), and the "mere possibility that the moving party's claim may be defeated does not preclude a finding that it is likely to succeed on the merits," *Pomicter v. Luzerne Cty. Convention Ctr. Auth. & SMG*, No. 16-632, 2016 WL 1706165, at *3 (M.D. Pa. Apr. 27, 2016).

In short, Great Lakes's burden to obtain preliminary injunctive relief is significantly lower than its burden to ultimately succeed on the merits of its claim.

**Great Lakes's claim.** Great Lakes filed a one-count complaint for breach of contract. That claim is governed by New York law pursuant to an applicable choice-of-law provision. *See* Ex. 2,

VCA at § 30.11. "In New York, the elements of a breach of contract claim are a contract, the plaintiff's performance under the contract, the defendant's breach, and damages resulting from the breach." *TNT USA Inc. v. DHL Express (USA), Inc.*, No. 09-481, 2012 WL 601452, at *5 (E.D.N.Y. Feb. 23, 2012) (internals omitted).

**A contract exists.** The VCA is a valid and enforceable contract that was negotiated between the parties, and Philly has never suggested otherwise. *See* Ex. 2, VCA. Following an extensive competitive bid process, Philly was awarded the contract to construct the Vessel. *See* Ex. 1, C. Gunsten Declaration at ¶¶ 8, 14–15. The parties' agreement was reduced to writing supported by mutual consideration (*i.e.*, the construction of the Vessel in exchange for money), and the parties' mutual assent and intent to be bound is demonstrated by their execution of the VCA and performance under it for the past three years. *See* Ex. 2, VCA. A valid and enforceable contract thus exists. *See Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (N.Y. App. Div. 2009) ("To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." (internals omitted)).

**Great Lakes has performed.** Great Lakes has paid Philly approximately 64% of the price under the VCA pursuant to agreed-upon milestone payments. *See* Ex. 3, VCA Amendment No. 2; Ex. 1, C. Gunsten Declaration at ¶ 59. Further, Great Lakes stands ready, willing, and able to pay the remainder of the price under the VCA once Philly demonstrates that it has earned further agreed-upon milestone payments. *See* Ex. 1, C. Gunsten Declaration at ¶ 60. Great Lakes has thus materially performed its commitments under the VCA. *See Vamvaship Mar. Ltd. v. Shivnath Rai Harnarain (India) Ltd.*, No. 06-1849, 2006 WL 1030227, at *2 (S.D.N.Y. Apr. 20, 2006) (holding that a party "commenced performance by tendering … payment").

**Philly has breached its obligations.** To date, Philly has breached its obligations under the VCA in at least the following ways:

a. **Modifying the build strategy without consent.** VCA § 8.7 requires that Philly obtain Great Lakes's approval to modify the build strategy for the Vessel. Ex. 2, VCA at § 8.7. But Philly has informed Great Lakes of its intention to float the Vessel and significantly alter the construction plan without Great Lakes's approval and over Great Lakes's strong objection, which could result in irreparable physical harm to the Vessel, including total loss. Ex. 1, C. Gunsten Declaration at ¶¶ 30–49, 65.

b. **Projecting to fail to timely deliver the Vessel.** The VCA obligates Philly to deliver the Vessel no later than February 14, 2025. Ex. 3, VCA Amendment No. 2. However, Philly recently forecasted delivery as late as September 30, 2026, ***593 days late***. Ex. 1, C. Gunsten Declaration at ¶¶ 17–22.

c. **Breaching the duty of diligence.** VCA § 9.4 imposes on Philly a duty of diligence. Ex. 2, VCA at § 9.4. Philly has breached its duty of diligence by, among other things, failing to prosecute the work under the VCA diligently to ensure the Vessel's completion by the contractual delivery date, by diverting resources from the Vessel to other projects in the shipyard, by laying off specialized labor necessary to complete the Vessel, and by refusing to undertake costs to make up for lost time (such as costs to have certain material delivered by air rather than by boat) unless Great Lakes contributes "acceleration costs." Ex. 1, C. Gunsten Declaration at ¶¶ 16–29, 54–55.

d. **Failing to create and maintain a project schedule.** VCA §§ 8.2 through 8.6 require Philly to create and maintain an updated project schedule that is fully resource loaded and logic linked that shows delivery of the Vessel by the contractual delivery date. Ex. 2, VCA at §§ 8.2–8.6. Philly has failed to maintain a fully resource-loaded and logic-linked schedule throughout construction and has failed to produce a fully resource-loaded and logic-linked schedule to support the schedule gains that Philly promises would result from its purported "float" strategy. Ex. 1, C. Gunsten Declaration at ¶¶ 41, 50–53.

e. **Failing to take action to recover lost time.** VCA § 8.13(d) requires Philly to take "actions as are reasonably practicable to ensure that the Vessel be completed by the Delivery Date," including "adding additional shifts or engaging additional workers or Subcontractors as necessary to ensure the Work is completed in such time." Ex. 2, VCA at § 8.13(d). Philly instead has refused to undertake costs to recover lost time in construction (such as costs to have certain materials delivered by air rather than by boat, among others) unless Great Lakes contributes "acceleration costs,"

has diverted resources from the Vessel to other projects in the shipyard, and has laid off specialized labor necessary to complete the Vessel. Ex. 1, C. Gunsten Declaration at ¶¶ 23–29, 54–55.

**Great Lakes has been damaged.** Philly has "acknowledge[d] and agree[d] that a breach" of "its obligations" regarding its duty of diligence "would present irreparable harm to" Great Lakes. Ex. 2, VCA at § 9.4(d). Courts applying New York law have held that this "contract language is sufficient to prove the fact of damages." *United Pool Distrib., Inc. v. Custom Courier Sols., Inc.*, No. 22-6314, 2024 WL 3163432, at *8 (W.D.N.Y. June 25, 2024).

\*   \*   \*

Great Lakes has thus demonstrated a likelihood of success on the merits because it has made a *prima facie* showing that there is a reasonable probability that Philly breached the VCA. *See Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F. Supp. 3d 722, 768 (E.D. Pa. 2021) (Marston, J.) ("A plaintiff need only show a reasonable probability of success on the merits." (collecting cases)).

B.   <u>**Great Lakes would suffer irreparable harm without a preliminary injunction.**</u>

"Irreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Hunter v. Cortland Housing Auth.*, 714 F. Supp. 3d 46, 56 (N.D.N.Y. 2024) (internals omitted). Absent preliminary injunctive relief, Great Lakes would be irreparably harmed in at least three ways.

***First***, Philly has "acknowledge[d] and agree[d] that a breach" of "its obligations" regarding its duty of diligence "would present irreparable harm to" Great Lakes and that Great Lakes "shall have the right to seek equitable relief, including an injunction, to prevent or rectify any such breach by" Philly. Ex. 2, VCA at § 9.4(d). New York courts considering similar language have held that a

contractual admission that breach of contract constitutes irreparable harm is sufficient to support injunctive relief. *See Heisman Trophy Tr. v. Smack Apparel Co.*, 637 F. Supp. 2d 146, 159 (S.D.N.Y. 2009) (finding irreparable harm and issuing a preliminary injunction where contract "stipulates that breach … would result in continuing and irreparable harm" (internals omitted)); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (a contract provision providing that plaintiff "shall be entitled to injunctive relief" because a breach "would cause irreparable injury" "might arguably be viewed as an admission" that "plaintiff will suffer irreparable harm"); *JLM Couture, Inc. v. Gutman*, No. 20-10575, 2021 WL 827749, at *21 (S.D.N.Y. Mar. 4, 2021) ("A court may consider" a "contract provision stating that a breach constitutes irreparable harm for which there is not an adequate remedy at law as an admission by the breaching party."), *vacated in part on other grounds*, 24 F.4th 785 (2d Cir. 2022).

Therefore, Philly has admitted to the fact of irreparable harm, and Philly's admission constitutes evidence of such harm. *See USA Techs., Inc. v. Tirpak*, No. 12–2399, 2012 WL 1889157, at *6 (E.D. Pa. May 24, 2012) (Savage, J.) ("[T]he parties' agreement that the breach of a contract would result in irreparable harm constitutes evidence of such harm.").

***Second***, if Philly were to fail to timely deliver the Vessel, Great Lakes would suffer reputational damage and loss of goodwill with its investors, customers, and in the marketplace. Ex. 1, C. Gunsten Declaration at ¶¶ 18, 61–64. Each of these categories of reputational damage independently constitutes irreparable harm.

As for Great Lakes's relations with its current and prospective customers, Philly's failure to timely deliver the Vessel would prevent Great Lakes from meeting its own obligations to customers in 2025 and 2026 that were assumed on the premise that Philly would timely deliver the Vessel. *Id.* at ¶ 62. This would irreparably damage Great Lakes's standing with its customer

relationships and its standing with prospective customers. *See Marcone APW, LLC v. Servall Co.*, 85 A.D.3d 1693, 1697 (N.Y. App. Div. 2011) ("The loss of goodwill and damage to customer relationships, unlike the loss of specific sales, is not easily quantified or remedied by monetary damages," and therefore constitutes irreparable harm.); *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 222 (N.Y. App. Div. 2009) ("Harm to business reputation is harm for which money damages are insufficient and for which injunctive relief may be appropriate[.]").

As it respects Great Lakes's investors, Philly's failure to timely deliver the Vessel would irreparably harm Great Lakes through a potential loss of investors and a chilling effect upon potential new investors. Ex. 1, C. Gunsten Declaration at ¶ 63; *see also N. Am. Soccer League v. Nat'l Football League*, 465 F. Supp. 665, 671 (S.D.N.Y. 1979) (finding irreparable harm and granting preliminary injunctive relief based on "a chilling effect … upon potential new investors").

Finally, Philly's failure to timely deliver the Vessel would irreparably harm Great Lakes by damaging its goodwill. Ex. 1, C. Gunsten Declaration at ¶ 64; *see also LVL Co., LLC v. Atiyeh*, 469 F. Supp. 3d 390, 423 (E.D. Pa. 2020) (Smith, J.) ("grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will" (internals omitted)); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (finding that "lack of control" of trademark that "potentially might result in a damaged reputation" constituted irreparable harm).

***Third***, removing the Vessel from its position in the dock and floating it into the harbor at this stage of construction threatens to irreparably physically damage the Vessel, including the potential for total loss. Ex. 1, C. Gunsten Declaration at ¶¶ 42—49, 65. Such damage to what would be the first United States-flagged, Jones Act-compliant subsea rock installation vessel for

wind turbine foundations, *id.* at ¶ 6, would irreparably harm Great Lakes. *See Destiny USA Holdings*, 69 A.D.3d at 222 ("the unprecedented nature and scope of the Project makes it unique, so that it has no established market value and any damages sustained could not be calculated with reasonable precision").

C.    **Granting Great Lakes's preliminary injunction and holding Philly to meet its obligations under the VCA would not result in greater harm to Philly.**

Great Lakes's requested preliminary injunction would only require Philly to meet its obligations under the VCA. *See, e.g.*, Ex. 2, VCA at §§ 1.8, 8.2–8.7, 8.13(d), 9.4; Ex. 3, VCA Amendment No. 2. There would thus be no harm to Philly if the Court granted Great Lakes's requested preliminary injunction. *See, e.g.*, *Rex Med. L.P. v. Angiotech Pharms.*, 754 F. Supp. 2d 616, 625 (S.D.N.Y. 2010) (issuing preliminary injunction where defendant was "attempting to circumvent its contractual obligations by arguing that performance of the Agreement is a severe hardship on the company"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 496 (E.D. Pa. 2000) (Kauffman, J.) ("The self-inflicted nature of any harm suffered by the wrongdoer … weighs heavily in favor of granting preliminary injunctive relief.").

The balance of harms therefore favors granting injunctive relief.

D.    **The public interests favor granting a preliminary injunction because there is a public interest to holding Philly to its contractual obligations.**

Courts applying New York law have consistently found that "the issuance of [an] injunction would serve the public interest" where it holds a defendant "to their contractual obligations." *Bank of Am., N.A. v. Yi*, 294 F. Supp. 3d 62, 82 (W.D.N.Y. 2018); *see also GE Transp. (Shenyang) Co. v. A-Power Energy Generation Sys., Ltd.*, No. 15-6194, 2016 WL 3525358, at *9 (S.D.N.Y. June 22, 2016) ("The public interest is served by the enforcement of parties' rights under their contract." (cleaned up)); *NML Capital, Ltd. v. Republic of Argentina*, No. 08-6978, 2012 WL 5895784, at *2

(S.D.N.Y. Nov. 21, 2012) (finding the "public interest of enforcing contracts and upholding the rule of law will be served by issuance of" a preliminary injunction); *Rex*, 754 F. Supp. 2d at 626 ("The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense.").

Therefore, the public interests favor granting Great Lakes's requested preliminary injunction because it would hold Philly to its obligations under the VCA. *See Baltimore & O.S.W. Ry. Co. v. Voigt*, 176 U.S. 498, 505 (1900) ("it must not be forgotten that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy").

## CONCLUSION

For the foregoing reasons, Great Lakes requests that the Court enter a temporary restraining order enjoining Philly from taking any action to remove the Vessel from its position in the dock and floating it into the harbor until the Vessel is ready to be outfitted according to the original, agreed-upon build strategy.

Further, Great Lakes requests that the Court enter a preliminary injunction that holds Philly to its contractual obligations. Specifically, a preliminary injunction (1) enjoining Philly from taking any action to remove the Vessel from its position in the dock and floating it into the harbor until the Vessel is ready to be outfitted according to the original, agreed-upon build strategy; (2) enjoining Philly from diverting shared resources from the Vessel to other projects in the shipyard; and (3) requiring Philly to (a) develop and maintain a fully resource-loaded and logic-linked schedule consistent with the VCA; (b) comply with its duty of diligence, including putting the necessary resources to the construction of the Vessel to achieve timely delivery; and (c) comply

with its duty to take actions to recover the project schedule, including placing all purchase orders required under the VCA within 60 days and paying for certain materials to be shipped by air.

Absent this preliminary injunctive relief, Great Lakes would be irreparably harmed, and Philly would be permitted to skirt its contractual obligations at Great Lakes's expense.

Date: November 20, 2024

Respectfully submitted,

/s/ *Wesley A. Prichard*
Thomas E. Birsic, Esq.
Pa. ID No. 31092
thomas.birsic@klgates.com
Wesley A. Prichard, Esq.
Pa. ID No. 324411
wesley.prichard@klgates.com
Falco A. Muscante II, Esq.
Pa. ID No. 333759
falco.muscanteii@klgates.com
**K&L GATES LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500

Rusty Hardin, Esq.
(*pro hac vice forthcoming*)
rhardin@rustyhardin.com
Terry D. Kernell, Esq.
(*pro hac vice forthcoming*)
tkernell@rustyhardin.com
Emily Smith, Esq.
(*pro hac vice forthcoming*)
esmith@rustyhardin.com
**RUSTY HARDIN & ASSOCIATES, LLP**
1401 McKinney, Suite 2250
Houston, Texas 77010
(713) 652-9000

*Counsel for Plaintiff Great Lakes Dredge & Dock Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all known counsel of record via the Court's CM/ECF system.

*/s/ Wesley A. Prichard*
Wesley A. Prichard