# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| |  |
|---|---|
| GREAT LAKES DREDGE & DOCK COMPANY, LLC, <br><br> *Plaintiff*, <br><br> vs. <br><br> PHILLY SHIPYARD, INC., <br><br> *Defendant*. | |

## DECLARATION OF CHRISTOPHER G. GUNSTEN, P.E.

I, Christopher G. Gunsten, P.E., declare as follows:

1. I am the Senior Vice President, Project Services & Fleet Engineering for Great Lakes Dredge & Dock Corporation, the parent of Great Lakes Dredge & Dock Company, LLC ("Great Lakes"), and I serve in the same role for Great Lakes.

2. I am over eighteen (18) years of age. Except as otherwise indicated, all facts set forth in this Document are based on my personal knowledge or my review of relevant documents.

3. If called upon to testify, I could and would testify competently to the facts set forth herein.

4. Great Lakes is the leading provider of dredging services in the United States, specializing in projects that help improve and protect our nation's infrastructure and coastlines.

5. Great Lakes recently identified an opportunity in the rapidly developing United States offshore wind market.

6. To take advantage of that opportunity, Great Lakes determined to invest in the build of the first United States-flagged, Jones Act-compliant subsea rock installation vessel for wind turbine foundations (the "Vessel").

7. Time is of the essence for Great Lakes as a first mover in the market.

8. Great Lakes initiated an extensive competitive bid process for the construction of the Vessel and invited multiple shipyards to participate.

9. Philly Shipyard, Inc. ("Philly"), a shipbuilder that constructs commercial and government vessels, is one of the shipyards that participated in the competitive bid process.

10. Throughout the competitive bid process, Great Lakes emphasized that time was of the essence for the Vessel's completion.

11. To effectively manage the timely delivery of a ship like the Vessel, the shipbuilder must create and maintain a schedule that is fully resource loaded and logic linked.

12. Philly initially proposed a schedule for the Vessel that did not meet Great Lakes's requirements, and so Philly effectively withdrew itself from consideration.

13. Philly later reinserted itself into the competitive bid process, providing and committing to a new schedule that met Great Lakes's requirements.

14. With Philly's commitment that it could complete and deliver the Vessel on an acceptable timeline, Great Lakes hired Philly to construct the Vessel.

15. On or about November 15, 2021, Great Lakes and Philly executed the VCA.

16. It recently became apparent that Philly's breaches of the VCA threatened to irreparably harm Great Lakes.

17. Philly's schedules are now showing delivery dates as late as September 30, 2026, 593 days past the February 14, 2025, contractual delivery date.

18. Such a delay would irreparably harm Great Lakes through reputational damage and loss of goodwill with its investors, current and prospective customers, and in the marketplace.

19. Philly's projected delays have recently accelerated.

20. On or about May 15, 2024, Philly proposed an August 2025 Delivery, which would be more than half a year late.

21. On or about August 26, 2024, Philly showed a delivery date of October 30, 2025, two more months of delay.

22. On or about October 5, 2024, Philly stated that it estimated a delivery date of September 30, 2026.

23. In Great Lakes's view, Philly's delays are exacerbated by its prioritization of other projects at the shipyard at the expense of making progress on the Vessel.

24. Philly has assigned only one individual exclusively dedicated to the construction of the Vessel.

25. All of Philly's other labor resources are shared between projects, and those shared resources have, in Great Lakes's view, been diverted to other customers who have placed orders for a series of ships with Philly (as opposed to Great Lakes's one-off Vessel), at the expense of progress on the Vessel.

26. For example, Philly is currently constructing a series of five National Security Multi-Mission Vessels ("NSMVs") for the United States Department of Transportation's Maritime Administration ("MARAD"), and Philly has been contracted to build a series of three container vessels ("CVs") for Matson Navigation Company, Inc. ("Matson").

27. Philly has also laid off labor that is needed for the Vessel. For example, on or about October 17, 2024, Philly disclosed to Great Lakes that it long ago laid off certain specialist outfitting workers required for the outfitting of certain components of the Vessel, which resulted in a workforce deficiency.

28. Philly's manpower deficiencies are causing delays.

29. Approximately 40% of the expected outfitting material for the Vessel has been delivered, but less than 20% of the delivered material is being worked on. The remainder of material is simply sitting at the dock and not being put to productive use.

30. Philly recently notified Great Lakes of its intent to remove the Vessel from its position in the dock and float it into the harbor.

31. Great Lakes has not consented to this change in the build strategy and has explicitly objected to it multiple times.

32. Philly recently informed Great Lakes that it plans to proceed despite Great Lakes's objections and that it chose not to weld Grand Block 14 to the hull of the Vessel, but instead lifted it out of the building dock in furtherance of this disputed change in build strategy.

33. Given that the Vessel is not near completion, Philly's proposal comes with multiple issues that portend further delay.

34. Philly's contested "float" proposal comes with the likelihood of significant delay and appears to be a way for Philly to progress its work with other customers that it prefers at the expense of the Vessel.

35. The Vessel in its current state cannot be removed from the dock and floated into the harbor.

36. The Vessel is not designed to be floated at its current stage of construction. Among other things, it would need to be waterproofed, which would take additional resources and manpower that are not reflected in the project's current schedule.

37. Philly's contested "float" strategy would accelerate Philly's projects for other customers who have placed orders with Philly for a series of ships, which would allow Philly to further divert shared labor resources from the Vessel to other customers.

38. The Vessel is currently located in the building dock at the shipyard, positioned ahead of NSMV #4. Philly proposes to "float" the Vessel into the harbor so that NSMV #4 can be moved ahead of the Vessel and to the outfitting dock. This would enable Philly to divert labor resources from building the Vessel to outfitting NSMV #4.

39. Before returning the Vessel to the building dock, Philly then proposes to place NSMV #5 in the building dock behind the Vessel, again enabling Philly to divert labor resources from building the Vessel to building one of a series of ships that was ordered by MARAD.

40. The "float" strategy that Philly proposes would also accelerate when it can begin building CV #1 for Matson, another ship that is one of a series of ships ordered.

41. Philly has pitched the "float" strategy to Great Lakes as reducing the estimated delivery durations for the Vessel, but Philly has not provided a fully resource-loaded, logic-linked schedule that would support the project gains that Philly promises. Great Lakes is therefore concerned that the "float" strategy will result in additional delay.

42. Removing the Vessel from its position in the dock at this stage of construction also puts the Vessel at risk of being damaged, including a total loss.

43. The Vessel is not designed to be waterproofed or floated at this stage of construction. Changing the design and taking actions to waterproof the Vessel at this stage could permanently damage it.

44. The original agreed build strategy does not contemplate moving the Vessel at this stage of construction from the dock, where it is safe, to the harbor. Moving the Vessel from the dock to the harbor and from the harbor to the dock puts the Vessel at risk of being damaged or destroyed while in transit.

45. The Vessel could be damaged while floated in the harbor, including a risk of total loss.

46. These risks are not present when the Vessel is in its position in the dock.

47. The Vessel being damaged or completely lost would cause Great Lakes irreparable harm.

48. In short, in Great Lakes's view, Philly's contested "float" strategy only benefits Philly and its other customers, MARAD and Matson, because it accelerates when Philly can begin outfitting work on NSMV #4, and when Philly can begin building NSMV #5 and CV #1.

49. In contrast, Great Lakes stands to gain nothing from Philly's contested "float" strategy. Philly has not demonstrated that it would result in any schedule gains for the Vessel or that the Vessel can be floated and maneuvered safely at its current stage of construction.

50. Throughout the project, Philly has failed to develop and maintain a fully resource-loaded, logic-linked schedule.

51. Great Lakes throughout the project has expressed to Philly its concern that Philly is working from an unacceptable schedule.

52. But Philly to date has failed to develop even a baseline schedule that Philly believes is obtainable against which to evaluate its progress.

53. This prevents Great Lakes from being able to monitor progress on the project and prevents Philly from demonstrating its achievement of project milestones to earn further payments under the VCA.

54. In Great Lakes's view, Philly has done and is doing nothing to make up for lost time, such as paying to ship certain materials by air rather than by boat or by upping the manpower devoted to constructing the Vessel to makes gains on the projected delivery date.

55. Despite repeated requests from Great Lakes and demands by Great Lakes under VCA § 8.13(d) that Philly take actions to recover the project schedule, Philly has refused to undertake any such measures unless Great Lakes contributes "acceleration costs."

56. Notwithstanding these and other repeated failures to perform, Great Lakes, despite its frustrations, made every effort to reach commercial resolutions with Philly.

57. Great Lakes's executives over the past month have objected to Philly's contested "float" strategy and have requested meetings with the decision-makers at the top of Philly's organization. Philly has pushed off those requested meetings and proceeded with its contested "float" plan.

58. Great Lakes also has not withheld payment from Philly, notwithstanding the disputes over Philly's failure to demonstrate that it has earned milestone payments.

59. To date, Great Lakes has paid Philly approximately 64% of the price under the VCA.

60. Great Lakes stands ready, willing, and able to pay the remainder of the price under the VCA once Philly demonstrates that it has earned further agreed-upon milestone payments.

61. Great Lakes would suffer irreparable harm if the Vessel were not timely delivered, including but not limited to (1) reputational damage in the marketplace; (2) Great Lakes's inability to meet its own obligations to customers in downstream contracts that were entered into in reliance on the timely delivery of the Vessel; and (3) reputational damage with stakeholders.

62. Philly's failure to timely deliver the Vessel would prevent Great Lakes from meeting its own obligations to customers in 2025 and 2026 that were assumed on the premise that Philly would timely deliver the Vessel. This would damage Great Lakes's standing with current customers and would have a chilling effect on Great Lakes's ability to solicit future customers. In

addition, Great Lakes cannot in good business conscience enter new contracts respecting the Vessel without knowing when the Vessel will be delivered.

63. Philly's failure to timely deliver the Vessel would irreparably harm Great Lakes through a potential loss of investors and a chilling effect upon potential new investors.

64. Philly's failure to timely deliver the Vessel would irreparably harm Great Lakes by damaging its goodwill.

65. If the Vessel were physically damaged or destroyed by Philly's contested "float" plan, Great Lakes could lose the benefit of being the first mover in the market because many shipyards capable of building the Vessel are overbooked, and prices to build ships are significantly higher now than when the VCA was entered. Restarting construction on the Vessel would thus cause Great Lakes irreparable harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  11/19/2024 _____

Signed by: *[signature]* 266134C96040482...
Christopher G. Gunsten, P.E.