# Exhibit 2

**VESSEL CONSTRUCTION AGREEMENT**

**BY AND BETWEEN**

**PHILLY SHIPYARD, INC.**
**(Builder)**

**AND**

**GREAT LAKES DREDGE & DOCK COMPANY, LLC**
**(Owner)**

**FOR**

**SUBSEA ROCK INSTALLATION VESSEL**

**And ROFR Vessel**

**Dated as of November 15, 2021**

**VESSEL CONSTRUCTION AGREEMENT**

**THIS VESSEL CONSTRUCTION AGREEMENT** (this "*Agreement*") is made as of the **15th day of November, 2021** (the "*Effective Date*"), between Philly Shipyard, Inc. (hereinafter, "*Builder*"), a Pennsylvania corporation whose principal place of business address is 2100 Kitty Hawk Avenue, Philadelphia, PA 19112 and Great Lakes Dredge & Dock Company, LLC (hereinafter, "*Owner*"), a Delaware limited liability company whose principal place of business address is 9811 Katy Freeway, Suite 1200, Houston, Texas 77024, for the design and construction of the Vessel (as defined below).

Builder and Owner agree as set forth below.

W I T N E S S E T H :

## Article 1    UNDERTAKING AND SCOPE OF WORK

1.1        Initial Undertaking.  Builder agrees to design and build at its own risk and expense and to sell and deliver to Owner, and Owner agrees to purchase, the Vessel (as defined below) on the terms and conditions as set forth herein.  The Vessel shall be a subsea rock installation vessel, constructed to the Design, for the Contract Price, all in accordance with the Contract Documents. The Initial Vessel (as defined below) shall be designated as Builder's Hull 038.  The ROFR Vessel (as defined below) shall be designated as Builder's Hull 039.

1.2        Specifications.    The Parties have agreed that the Vessel shall be built to the specifications set forth in the attached Exhibit A (the "*Specifications*").  The Specifications may be changed from time to time during the construction of the Vessel in accordance with the procedures stated below in Article 10, and such changes will be set forth in one or more sequentially numbered Change Orders (as defined below).

1.3        Vessel Characteristics.  Without limitation to the Specifications, the Vessel shall have the following principal characteristics, subject to verification and adjustment as necessary upon Builder's receipt of the conversion of the Design from imperial measurements to metric pursuant to Section 7.1(c):

| | | | |
|---|---|---|---|
| Length overall: | 140.5 | meters | (461 feet) |
| Breadth, molded: | 34.1 | meters | (112 feet) |
| Depth at Main Deck: | 10.7 | meters | (35 feet) |
| Draught (summer) | 8.2 | meters | (26.9 feet) |
| Complement | 45 | persons | |

- 1 -

| Sailing Range | 10,000 | nautical miles |
| Trial Speed | 12.5 | knots |
| Service Speed | 12.0 | knots |

1.4      U.S. Build.  Builder is to ensure that the Vessel is built in the United States as required by United States law to be eligible for documentation under the United States flag with a coastwise trade endorsement; including ensuring that all major components of the hull and superstructure used in the construction of the Vessel are fabricated in the United States, and that all construction and all assembly for the construction of the Vessel is done in the United States to the extent required by law for the Vessel to receive a United States coastwise trade endorsement.

1.5      Scope of Work.  Except as expressly provided herein, the work to be performed by Builder hereunder shall include all labor, overtime labor, standby labor, supervision, design, engineering, planning, construction, methods, Materials and supplies (including fuel, lubricating oils, hydraulic oils, greases, fresh water), tools, equipment, procurement, transportation, taxes, permits and fees and all other facilities and services necessary to provide Owner with the completed Vessel constructed in accordance with the Specifications, as amended from time to time in accordance with this Agreement.

1.6      Regulatory Approvals.

(a)      The Vessel shall be constructed in accordance with the Specifications as well as all applicable rules and regulations of the Regulatory Authorities, including, without limitation, Coast Guard regulations, EPA regulations, the International Convention on Load Lines (as amended), and all applicable Rules of the Classification Society.

(b)      Builder shall have sole and exclusive responsibility to obtain timely any approval required by any Regulatory Authority for any Detailed Design and Production Design derived by Builder from the Specifications, the Design, and the Contract Drawings, and for any Builder furnished equipment that requires approval by any Regulatory Authority.

(c)      Without limitation to the foregoing, Builder shall be solely responsible to obtain all necessary approvals from the Regulatory Authorities for the construction and classification of the Vessel, including the final approval of all plans, arrangements, and drawings.

(d)      Builder shall provide copies to Owner of each and all stamped plans, approval letters, equipment documentation approvals, Class survey reports, and all other

- 2 -

approvals issued by Regulatory Authorities as Builder receives the same from the Regulatory Authorities.

(e)     The Vessel shall be documented under the U.S. flag with the Coast Guard by Owner at its own cost and expense.

1.7     Delivery.  Builder shall deliver the Vessel to Owner at the Delivery Point, safely afloat, in all respects fully seaworthy, fully constructed, fully outfitted, and fully tested in accordance with the Design as set forth in the Contract Documents, subject to Minor Non-Conformities.

1.8     Delivery Date.  Delivery shall be made by November 15, 2024 (the "*Delivery Date*") subject to any Permissible Delays permitted in accordance with Article 16.

1.9     ROFR Vessel.  Owner shall have the right of first refusal to purchase an additional Vessel (the "*ROFR Vessel*") on the terms and conditions set forth below:

(a)     Builder hereby grants to Owner a right of first refusal (a "*First Refusal Right*"), to be exercised during the period commencing on the Effective Date of this Agreement and ending twelve (12) months after the Effective Date of this Agreement (such period, the "*FRR Period*"), to purchase the ROFR Vessel to be constructed and sold by Builder in the building slot for Builder's Hull 039, with the same specifications as the Vessel, on the terms set forth in this Agreement, but with changes to the Contract Price and Delivery Date as set forth herein.  During the FRR Period, Builder will notify Owner if Builder is having serious discussions with a third party for a commercial project, or is preparing to submit a binding proposal to the government for a government project, in each case, to build vessels in the building slot for Builder's Hull 039 (such notification, the "*FRR Builder Notice*").  For clarity, the building slot for Builder's Hull 039 is the first building slot following the building slot for the fifth National Security Multi-Mission Vessel ("*NSMV 5*").

(b)     Provided that Owner is not in default under this Agreement pursuant to Section 18.10, notwithstanding any cure period that may be applicable, Owner may exercise the First Refusal Right with respect to the ROFR Vessel by giving written notice of exercise to Builder within thirty (30) Days after receipt of the FRR Builder Notice (a "*FRR Owner Notice*").  If Builder does not receive the FRR Owner Notice within such thirty (30) Day period, then Owner's First Refusal Right shall be deemed expired.

(c)     If Owner's First Refusal Right is exercised within the foregoing period, the initial Delivery Date for the ROFR Vessel will be determined by a schedule mutually agreed between the Parties at the time that Owner exercises its First Refusal Right, provided, however, that the duration of the construction period shall not exceed that used for the first Vessel to be constructed under this Agreement (the "*Initial Vessel*") except to the extent an extension is required due to changes in Builder's production approach or unless otherwise mutually agreed in writing.

(d)     All other provisions of this Agreement shall apply in connection with the construction of the ROFR Vessel, *mutatis mutandis*.

(e)     For convenience, all subsequent references below shall be to a single Vessel, but without limitation of Owner's right to order the ROFR Vessel; where this Agreement refers to "the Vessel," such reference shall be deemed to refer to either the Initial Vessel or the ROFR Vessel, as applicable. For clarity, the Letter of Credit required in Article 6 for "the Vessel" secures Builder's obligations with respect to both the Initial Vessel and the ROFR Vessel.

(f)     Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, amendments, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Section 1.9 and the consummation of the transactions contemplated hereby.

<u>**Article 2     CONTRACT INTERPRETATION**</u>

2.1     <u>Defined Terms in this Agreement</u>.  Capitalized terms used in this Agreement are defined herein, or in Schedule X.  Terms defined in this Agreement which are used in the other Contract Documents or Change Orders but not otherwise defined therein, shall have the meanings assigned to them in this Agreement.

2.2     <u>Other Words</u>.  Any word not specifically defined herein shall be construed and interpreted according to its ordinary meaning and shall be used so as to fairly accomplish the purposes and intentions of the Parties.

2.3     <u>Singular and Plurals</u>.  Where the context requires, the singular includes the plural and vice versa.

7.10        Builder's Disclaimer of Liability for Basic Design.  Builder shall not be liable for any errors, omissions, defects, or failures in the Basic Design, as provided by Owner to Builder, and Builder makes no representations or warranties with respect to the Vessel's speed, tonnage, cargo capacity, displacement, or fuel consumption; provided, however, that nothing herein shall relieve Builder from liability for any errors, omissions, defects, or failures in the performance of the Work, including the workmanlike performance of Builder's obligations under Article 9.  Any errors, omissions, defects, or failures in the Basic Design as provided by Owner to Builder that require changes to the Work shall be addressed in accordance with the provisions of Section 10.6(b).

## Article 8        PROJECT SCHEDULE AND COORDINATION

8.1        Builder's Obligation to Establish and Maintain Project Schedule.  Builder shall establish a baseline project schedule and maintain throughout the performance of the Work a detailed current project schedule and execution plan (the "*Project Schedule*") in electronic form including embedded logic and data for completion of the Work by the Delivery Date.  The Project Schedule shall remain a living document and shall include all significant activities in the design, procurement, construction, and testing and commissioning phases of the Vessel, including the work of Material Subcontractors or Suppliers.  Unless otherwise agreed, Builder shall maintain the Project Schedule from a Level 4 up.  Builder shall update the baseline project schedule if at any time the Project Schedule no longer shows the status of the Work with reasonable accuracy.

8.2        General Project Schedule Requirements.  The Project Schedule shall be a resource loaded schedule that includes a critical path analysis and reflects resource requirements.  More specifically, the Project Schedule shall clearly show the critical path and the schedule's calendar shall be set up to include the number of Working Days per week, the number of shifts per Day, and non-Working Days and holidays.  The format of the Project Schedule shall be subject to Owner's approval, such approval not to be unreasonably withheld, conditioned or delayed.

8.3        Specific Project Schedule Requirements.  Without limitation to Sections 8.1 and 8.2, the Project Schedule shall include the following elements and features:

(a)        the dates for commencement and completion of the Work, reflecting an overall project execution strategy;

(b)        description of the Work in sufficient detail to allow weekly progress measurement;

(c)        all significant activities in the design, procurement, construction, and testing and commissioning phases of the Vessel, including the work of Subcontractors

or Suppliers, including requests and deadlines for required vendor-furnished information;

(d)     sequencing and dependencies of all activities, and all predecessors and successors to each activity, including vendor-furnished scheduling information and constraints;

(e)     activity durations, including start and finish dates;

(f)     all points of interface between Owner and Builder, including instances where performance of the Work depends upon Owner, such as dates on which Owner information and Owner Furnished Equipment ("*OFE*") are required;

(g)     scheduling float for component activities and total float;

(h)     due dates for engineering design deliverables;

(i)     required-in-yard dates for all major and long-lead (exceeding one hundred and eighty (180) Days from order to delivery) Materials and equipment;

(j)     minimum leads or lags;

(k)     no constraints of major milestones, including Vessel Delivery;

(l)     the expected surveying and testing schedule for the various components of the Work; and

(m)     the dates of expected completion of each Stage of Completion task set forth in Exhibit O.

8.4     <u>Project Schedule</u>.  Builder has provided to Owner a preliminary schedule attached hereto as Exhibit H.  Not later than 30 Days following the Effective Date, Builder shall provide Owner with access to a detailed schedule for the Work to be accomplished during the period between the Effective Date and Builder's development of the Project Schedule as required Sections 8.1 to 8.3.  Not later than ninety (90) Days following the Effective Date, Builder shall provide Owner with access to the detailed Project Schedule prepared in accordance with the requirements of Sections 8.1 to 8.3.

8.5     <u>Maintenance of Project Schedule</u>.  Builder shall actively maintain the Project Schedule on an ongoing basis.  Builder shall update the status of the Work in advance of each weekly status meeting held in accordance with Section 8.10 unless otherwise agreed in writing.

8.6      Updates to Project Schedule.  Updates to the Project Schedule and/or the status of the Work shall include each activity's actual start date, actual finish date, and the remaining duration of the Work, and shall reflect the effect of Change Orders, if any.

8.7      Modifications to Build Strategy.  Following the availability of the initial Project Schedule as provided in Section 8.4, Builder may, in the exercise of Good Shipbuilding Practice, propose a modification to the build strategy of the Vessel that alters the predicates to milestone payments from those set forth in this Agreement, but such modification shall be permitted only upon prior written approval by Owner, such approval not to be unreasonably withheld, conditioned or delayed.

8.8      Record of As-Built Project Schedule.  Builder shall provide to Owner an as-built Project Schedule in electronic format for the permanent project record not later than thirty (30) Days following Delivery of the Vessel.

8.9      Remedy in Event of Failure to Maintain Project Schedule.  If Builder fails to provide access to the initial detailed Project Schedule by the date required in Section 8.4, or if Builder thereafter fails to actively maintain the Project Schedule as required by this Article 8, Owner shall notify Builder of such failure in writing.  If Builder fails to remedy such failure within thirty (30) Days, then Owner shall have the option thereafter, in its sole option and absolute discretion, to terminate this Agreement in its entirety.  Such thirty (30) Day period shall not include time lost due to causes that are beyond the reasonable control of Builder and that could not be mitigated by commercially reasonable actions of Builder.

8.10     Weekly Status Meetings.  The Parties' representatives shall meet (in person, by conference call, or by other mutually agreed electronic means), not less frequently than weekly, unless otherwise agreed, to discuss the status of the Work and relevant issues, which may include, but need not be limited to:

> (a)      the status and progress of the Work, including a two (2) week "look ahead" with regard to planned activities and expected progress;
>
> (b)      S-Curve charts (to be reviewed monthly), including Baseline S-Curve, Target S-Curve, and Actual S-Curve showing percentage of completion;
>
> (c)      any information needed by Builder, Owner, or the Classification Society to advance the Work;
>
> (d)      pending Change Orders;
>
> (e)      the integration of OFE;

(f)     any Owner concerns with the maintenance of the Project Schedule;

(g)     test and inspection schedules;

(h)     commissioning plans;

(i)     Trials; and

(j)     any other matters pertinent to construction and Delivery of the Vessel.

8.11     Monthly Status Report.  Builder shall provide Owner with a written report on the status of the Work on a monthly basis (a "*Monthly Status Report*"), in a form as reasonably agreed between the Parties.  The Monthly Status Report should generally include, but need not be limited to:

(a)     *Overview*:  An overview of the status of the Work;

(b)     *Timeline*:  A summary timeline of progress to date and work planned for the following month at the grand block level (or such other level as otherwise mutually agreed);

(c)     *PTS/PD Support Status*:  A summary of the status of Procurement Technical Specifications, purchase descriptions, and purchase orders issued in support of the Work;

(d)     *RFI Support Overview*:  A summary of the requests for information that have been fielded by Builder in connection with the development of the Detailed Design;

(e)     *Deliverables Status and Projected Schedule*:  A summary of the status of the Work and Project Schedule projections;

(f)     *Class Overview and Comment Tracking*:  A summary of the status of the regulatory review of the Work by the Regulatory Authorities, including the status of submittals;

(g)     *Weight Tracking*:  A summary of the weight budget and tracking in connection with the Vessel;

(h)     *Contract Discrepancies and Solutions*:  A summary of the status of any outstanding contract disputes and closures of disputes;

(i)     *Change Order Status*:  A summary of the status of the Change Order process, including data concerning Change Orders proposed and resolutions;

- 22 -

(j) *Risk Register*:  The status of identified risks that may pose a major or significant impact to the Project Schedule;

(k) *Safety*:  A summary of the safety statistics for the project;

(l) *Project Progress*:  A collection of relevant visual data sets such as graphs S-Curves, etc.;

(m) *Other Matters*:  A summary of any other matters that may be relevant to or affect the progress of the Work; and

(n) *Conclusion and Look-Ahead*:  A summary of the status of the Work and Builder's focus for the next month.

8.12　　　　<u>Intent of Weekly Status Meetings and Monthly Status Reports</u>.  Without limitation to the provisions of this Agreement that may require written notices, approvals, or other communications, the Parties mutually intend that they shall communicate as needed to facilitate the performance of the Work.  The intent of the weekly status meetings and Monthly Status Reports is to facilitate those communications.  The Parties may agree to provide greater or lesser details in connection with their communications under Sections 8.10 and 8.11 as the Parties determine to be appropriate.

8.13　　　　<u>Actions in Event of Progress Issues</u>.

(a) *Builder Notice of Insufficient Progress*.  If the actual progress of the Work in comparison to the Project Schedule indicates that the Work is not substantially on schedule as set out in the Project Schedule and that the completion of the Vessel by its Delivery Date is in jeopardy, then Builder shall promptly notify Owner and provide a proposed revision to the Project Schedule with such adjustments to sequencing or allocation of resources as may be commercially reasonable to overcome such delays and complete the Vessel by the Delivery Date or as soon thereafter as reasonably practicable.

(b) *Owner Notice of Progress Concerns*.  If Builder fails to provide such notice and take such action, then Owner shall notify Builder of its concerns (without prejudice to any of Owner's other rights pursuant to this Agreement).

(c) *Builder Revision of Project Schedule*.  In such case, within fourteen (14) Working Days thereafter, Builder shall provide to Owner a revised Project Schedule showing such adjustments as necessary to complete the Vessel by the Delivery Date or as soon thereafter as reasonably practicable.

(d)     *Builder Actions to Recover Project Schedule*.  Builder shall take such as actions as are reasonably practicable to ensure that the Vessel be completed by the Delivery Date or as soon thereafter as reasonably practicable, including adding additional shifts or engaging additional workers or Subcontractors as necessary to ensure the Work is completed in such time.

(e)     *Owner's Right to Request Measures to Recover Project Schedule*.  Owner has the right to request Builder to carry out such measures as set out in Subsection (d) as Owner deems necessary to ensure the Vessel is delivered by the Delivery Date or as soon thereafter as reasonably practicable.  Upon such request, Builder and Owner shall consult with regard to appropriate measures to recover the Project Schedule, and Builder shall take such measures as requested by Owner unless Builder establishes that such measures are not commercially reasonable or are unlikely to be effective.  If as a result of such measures taken pursuant to this Subsection, the Vessel is delivered in advance of the Delivery Date and the costs of measures requested under this Subsection are greater than the early delivery bonus provided under Section 17.1, then such additional costs shall be for the account of Owner.

(f)     *Recovery of Time Lost to Permissible Delays*.  If Owner determines that acceleration of the Project Schedule is necessary to make up time lost due to Permissible Delays, Owner may request Builder to add additional shifts, engage additional workers or subcontractors, or take other actions for the purpose of overcoming such Permissible Delays.  Upon such request, Builder and Owner shall consult and Builder shall take such measures as the Parties determine may be commercially reasonable and likely to be effective.  The added costs of any such actions shall be for the account of Owner.  Such additional costs shall be directed and documented as a Change Order in accordance with Article 10.

8.14        Remedy in the Event of Insufficient Progress.  Without limitation to the provisions of Section 8.11, if the Project Schedule shows that the actual date on which the Vessel will be delivered will be more than one hundred and five (105) Days later than the Delivery Date, such delay shall be an event of default and Owner shall be permitted to terminate this Agreement pursuant to the provisions of Section 18.2, subject to Builder's right to cure such event of default as provided therein.

## Article 9    PROSECUTION OF THE WORK

9.1          <u>Builder's Obligations</u>.  Builder shall provide at no charge other than the Contract Price all things required for the complete performance of the Work, except for such items as are specifically required by the Contract Documents to be furnished by Owner.  If Owner exercises its one or more of its options for any of the items identified in the Specification as "Options," then such items shall be included in the Work, subject to a Change Order agreed in accordance with Article 10.

9.2          <u>Allocation of Costs of Services and Stores</u>.

(a)     Except where expressly stipulated to the contrary, Builder shall provide and pay for all labor, overtime labor, standby labor, supervision, design, engineering, planning, construction, methods, Materials and supplies (including fuel, lubricating oils, hydraulic oils, greases, fresh water), tools, equipment, procurement, transportation, taxes, permits and fees and all other facilities and services necessary to complete the Vessel for the Contract Price by the Delivery Date.

(b)     Owner shall take over and pay for, at Builder's documented cost, reasonable amounts of all stores remaining aboard the Vessel at the time of the Vessel's Delivery, excluding fresh water, but including fuel oil, diesel oil, lubricating oil, hydraulic oil, and greases.

9.3          <u>Time is of the Essence</u>.  Builder expressly understands that time is of the essence for Owner and that an essential basis of consideration for this Agreement and a fundamental reason why Builder's proposal has been selected and that Owner has entered into this Agreement with Builder is the representation by Builder and the commitment made by Builder in this Agreement that, except for Permissible Delays excused in accordance with the terms of this Agreement, Builder can and will perform the Work and can and will deliver the Vessel by the Delivery Date.

9.4          <u>Builder's Duty of Diligence</u>.

(a)     *Builder to Proceed with Diligence*.  Without limitation to Section 9.3, Builder shall at all times prosecute the Work diligently to ensure its completion in full accordance with the Contract Documents within the time required for delivery of the Vessel by the Delivery Date or as soon thereafter as reasonably practicable.

(b)     *Builder to Furnish Sufficient Workers and Resources*.  Builder shall at all times furnish sufficient numbers or amounts of properly skilled and qualified

workers, acceptable Materials and equipment and adequate services and tools and equipment necessary for the Work and the delivery of the Vessel by the Delivery Date or as soon thereafter as reasonably practicable. Builder shall not fail to allocate all necessary and available resources as reasonably practicable to the timely completion of the Work to prevent or alleviate any actual or potential delay under any circumstances.

(c)     *Builder to Prioritize Completion*.  Builder expressly agrees it will not take, or fail to take, any action based on an assumption that the payment of liquidated damages would be more economically advantageous for Builder than the cost of allocating necessary available resources to the construction of the Vessel that, if so allocated would prevent or lessen any delay in the delivery of the Vessel.

(d)     *Owner's Right to Equitable Relief*.  Builder acknowledges and agrees that a breach by Builder of its obligations under this Section 9.4 would present irreparable harm to Owner and Owner shall have the right to seek equitable relief, including an injunction, to prevent or rectify any such breach by Builder.

9.5     <u>Builder's Standard of Performance Generally</u>.  Builder shall perform all of the Work in a good and workmanlike manner and in accordance with the Classification Society rules and standards set forth in the Specifications, Contract Documents, and the requirements of the governing Regulatory Authorities.  Builder shall require its Subcontractors and Suppliers to perform to the same standard of performance.

9.6     <u>Builder's Standard of Engineering Performance</u>.  Builder shall provide all engineering and design services required for the performance of the Work utilizing Good Shipbuilding Practice and the generally accepted standard of care, skill, and diligence as would be provided by an engineering or naval architecture firm experienced in supplying engineering or naval architecture services nationally to the United States' maritime industry.

9.7     <u>Builder's Duty Regarding Certification and Sealing</u>.  Builder shall ensure that all Work requiring certification shall be duly certified, and that all designs requiring sealing shall be sealed by professional engineers licensed and properly qualified to perform such engineering services in the appropriate jurisdiction.

9.8     <u>Builder to Furnish</u>.  Builder is responsible to provide a suitable location at its Shipyard for the full and timely construction of the Vessel together with all labor, management, tools, equipment, Materials, services, and fees necessary for the construction, completion, inspection, and certification of the Vessel.  Without limitation to the foregoing or to the provisions

of Section 9.9, Builder also agrees to furnish a suitable location for the storage of OFE in accordance with Good Shipbuilding Practice, including without limitation the protection of OFE from the elements, theft, and damage as may be required by the nature of specific OFE.

9.9        Duties with Regard to OFE.

(a)        Exhibit B attached hereto identifies all OFE and vendor furnished information for OFE, together with the fair market value of such equipment and appurtenances for use in determining the policy value of Builder's Risk Insurance under Section 15.1(c).  The cost of Builder's Risk Insurance for OFE (for values shown in Exhibit B) shall be for the account of and paid by Builder. If Owner requests Builder to place additional insurance, the cost to Owner will be Builder's incremental cost for such additional insurance.  OFE and vendor furnished information shall be delivered at Owner's risk (as between Owner and Builder), free of cost and expense, including the payment of any applicable sales, use or excise taxes,  to Builder at Builder's Shipyard in the proper condition ready for installation in or on the Vessel by the dates set forth in Exhibit B.

(b)        Builder shall receive, store, protect, and insure all OFE to be incorporated into the Vessel delivered to the Shipyard, provided, always, that Builder shall not be responsible for quality, efficiency and/or performance of any OFE.  Upon receipt of such OFE at the Shipyard, Builder shall inspect for, and note on the carrier's receipt, any shipping damage that is reasonably ascertainable upon a reasonable examination of the item, material, and packaging, and check that the item or material conforms to the applicable Bills of Lading with regard to item description and quantity.

(c)        Upon delivery of each item of OFE to the Shipyard, as soon as possible, but not later than the following Working Day, Builder shall notify Owner's Representative of such delivery.  Upon such notification, Owner's Representative shall, at Owner's expense and risk, inspect such OFE.

(d)        Builder shall have the duties of a bailee with respect to all OFE in Builder's custody, and Builder shall be liable to Owner to the extent of available insurance coverage for any damage to, or loss of, any OFE while in Builder's custody howsoever occurring, excepting from acts or omissions of Owner.

(e)        Provided that Builder has complied with the obligations of this Section 9.9, Builder shall not be liable for any damage to an item of OFE for loss or damage arising prior to delivery to the Shipyard.

- 27 -

(f)     Owner shall be responsible for providing Builder accurate values of all OFE upon Builder's request.

(g)     To facilitate installation or loading by Builder of OFE in or on the Vessel, Owner shall furnish Builder with the necessary specifications, plans, drawings, instruction books, manuals, test reports and certificates for such OFE as may be required by the Regulatory Authorities or otherwise.

(h)     Owner shall, without charge to Builder, engage the representatives of the manufacturers of the OFE to provide supervision during the installation of the OFE, without limitation to Builder's responsibilities under this Agreement.

(i)     Owner shall be responsible for the testing and commissioning of the OFE, and Builder shall provide reasonable assistance in connection with such testing and commissioning.

(j)     If Builder discovers any error in the necessary specifications, plans, drawings, instruction books, manuals, test reports and certificate with respect to any OFE, Owner shall be responsible for the cost and schedule impacts of any modifications to the Vessel made necessary as a result of such error for Builder to be able to install and test such OFE.

(k)     Any and all of the OFE shall be subject to Builder's reasonable right of rejection, as and if such OFE may be found to be unsuitable or in an improper condition for installation.  However, if so requested by Owner, Builder may propose a Change Order to repair or adjust the OFE pursuant to Article 10, without prejudice to Builder's other rights hereunder.

(l)     Should Owner fail to deliver any of the OFE within the time designated, the period of such delay in delivery shall be a Permissible Delay under Article 16, to the extent that such delay affects the Delivery Date and the effects of the delayed delivery cannot reasonably be avoided or otherwise recovered in the Project Schedule.  In addition, Owner shall be responsible to reimburse Builder for all losses and damages incurred by Builder by reason of such delay in delivery of the OFE, with such Permissible Delay and reimbursement documented as a Change Order pursuant to Article 10.  If a delay in delivery of any of the OFE exceeds thirty (30) Days, then Builder shall consult with Owner regarding proceeding with construction of the Vessel without installation of such late OFE in or on the Vessel, subject to agreement pursuant to Article 10, and Owner shall not refuse to take delivery of the Vessel for

- 28 -

failure to install such late OFE. Such process shall be without prejudice to Builder's other rights as provided herein.

(m)     Builder shall not be deemed to have extended to Owner any warranty as to OFE other than the warranty of workmanship in the installation thereof, as set forth in Article 14.

9.10        Compliance with Regulatory Authorities.

(a)     *Builder to Comply with Regulatory Authorities*. Subject to Article 21, Builder will comply with, and construct the Vessel to comply with, all applicable requirements of governing Regulatory Authorities in effect as of the Effective Date.

(b)     *Regulatory Fees*. All fees and charges of a Regulatory Authority, including fees and charges for inspection of the Work shall be for the account of and paid by Builder.

(c)     *Changes Necessary for Compliance*. If after the Effective Date Builder becomes aware that any portion of the Contract Documents do not comply with any rules, regulations, or requirements of the Regulatory Authorities, Builder shall promptly notify Owner of such non-compliance. Any alterations in the Work required to correct such non-compliance shall be addressed through a Change Order in accordance with Section 10.6.

9.11        Owner's Review of Plans and Drawings.

(a)     *List of Plans and Drawings*. Within thirty (30) Days after the Effective Date, the Parties shall mutually agree upon a list of the plans and drawings for the Vessel to be submitted by Builder to Owner and the submittal schedule therefor. Builder shall submit electronic copies of such plans and drawings in English to Owner and Owner shall have fourteen (14) Days to review and comment.

(b)     *Owner Review of Plans and Drawings*. Owner shall, within such fourteen (14) Day period, return to Builder electronic copies of such plans and drawings with Owner's comments, if any. In the event that Owner shall fail to return such plans and drawings to Builder within such fourteen (14) Day period, Owner will be deemed to have no comments on such plans and drawings.

(c)     *Builder to Respond to Comments*. Builder shall respond to Owner's comments within fourteen (14) Days of receipt. In the event that Builder shall fail to

respond to Owner's comments within such fourteen (14) Day period, such comments shall be deemed to have been accepted.

(d)     *Changes to Plans and Drawings*.  Any request by Owner for changes to any plans and drawings, other than those changes required to comply with the Specifications, Good Shipbuilding Practice, or requirements of the Regulatory Authorities in effect as of the Effective Date, shall be handled as a request for a Change Order in accordance with Article 10.

(e)     Any plans which subsequent to Owner's comments require alteration shall be resubmitted to Owner for comments, if any, on the alteration and its impact in accordance with this Section 9.11.

9.12     Installation of Materials.

(a)     *Builder to Install Materials*.   Builder will provide and/or install and commission all Materials shown in the Specifications, including the installation of OFE, except those items which the Specifications state are to be installed by Owner or its separate contractors.

(b)     *Reasonable Assistance with Other Installations*.  With respect to such items to be installed by Owner or its separate contractors, Builder shall provide reasonable assistance with respect to such installation in accordance with the Contract Documents and the Project Schedule.

9.13     Installation and Commissioning of Equipment.  Builder shall allow sufficient time and working area to allow the timely and safe installation and commissioning of all equipment and the loading of supplies prior to the Vessel's departure voyage.

9.14     Builder is an Independent Contractor.  The Parties agree and understand that Builder is an independent contractor in the performance of the Work, maintaining complete control of its workers, the worksite, and its operations.  Neither Builder nor anyone employed, engaged, or subcontracted by Builder shall become an agent, representative, servant, or employee of Owner in the performance of the Work or any part of it.  Subject to Owner's rights upon the occurrence and during the continuation of an event of default under Article 18, Owner shall have no right or authority to supervise, direct, or instruct Builder's personnel or to bind Builder in any way to any third party.

9.15     No Agency.  This Agreement does not convey any agency authority on Builder, and Builder shall have no authority whatsoever to act on behalf of Owner or to bind Owner in any way, except as may be provided expressly elsewhere in this Agreement or in separate documents

for specified purposes.  Builder expressly agrees that it shall not attempt or purport to act on behalf of Owner without Owner's prior express written authorization.

9.16        Builder's Right to Subcontract.  Builder shall be responsible for completion of the Work as a whole.  Builder may allocate certain portions of the Work to be performed under subcontracts or similar agreements between Builder and Subcontractors, and Owner shall have no liability for such subcontracts or similar agreements.  Nothing contained in the Contract Documents shall create any contractual relationship between Owner and any Subcontractor.

9.17        Designation of Subcontractors and Suppliers; Makers List.

(a)      *Makers List*.  A list of acceptable Suppliers and Subcontractors for Materials and services to be provided in connection with the Work is set forth as an addendum to the Specifications (such list, the "*Makers List*").

(b)      *Sole Acceptable Subcontractors or Suppliers*.  In the event that the Makers List identifies a sole acceptable Subcontractor or Supplier, and such Subcontractor or Supplier presents pricing or terms different from those advised to Builder by Owner prior to the Effective Date and set forth in Exhibit N, then the Parties shall consult and cooperate to resolve the discrepancy through communications with the selected Subcontractor or Supplier, selection of an alternative Subcontractor or Supplier, or such other actions as may be mutually agreed.  Any change in the price shall be for the account of Owner, and the Parties shall execute a Change Order to document any such difference in price, impact on the Project Schedule, or change in terms.

(c)      *Builder to Select Suppliers and Subcontractors*.  Builder shall have the right to select any of the Suppliers and Subcontractors listed on the Makers List. Builder may also select additional Suppliers and Subcontractors not listed on the Makers List, subject to Owner's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed.   Builder shall be responsible for the price and schedule impacts and any technical deficiencies of any Builder-selected Supplier or Subcontractor.

(d)      *Notice of Selection of Suppliers and Subcontractors*.  Builder will advise Owner of individual Suppliers and Subcontractors selected by Builder at least fifteen (15) Days prior to any order being placed.

(e)      *Owner's Right to Designate Suppliers and Subcontractors*.  If Owner requests Builder to order any Materials or services from a Supplier not selected by Builder from the Makers List, or to use any Subcontractor not on the Makers

- 31 -

12.13     <u>No Waiver of Builder's Contractual Obligations</u>.   Neither the observations of Owner, nor any failure by Owner to notify Builder of a non-conformity, nor acceptance of Work tested, tried, or inspected, shall be deemed to relieve Builder of its obligation to deliver the Vessel in compliance with the Contract Documents and to remedy any warranty defects identified during the Warranty Period in accordance with Article 14.

12.14     <u>Certificates of Testing</u>.   Subject to any contrary provisions of the Contract Documents, Builder shall promptly obtain and deliver to Owner all required certificates of testing, inspection, or approval.

## Article 13   TRIALS AND DELIVERY

13.1     <u>Trials</u>.

(a)     *Factory Acceptance Tests.*   Unless otherwise agreed, Builder shall attend Factory Acceptance Tests for long-lead time items as identified in the Makers List.  Builder shall provide to Owner a schedule of Factory Acceptance Tests and, for any Factory Acceptance Tests selected by Owner as identified in the Makers List, shall at a minimum give notice of each such Factory Acceptance Test in accordance with Section 12.5(b).

(b)     *Dock Trials*.   Upon completion of the Work on the Vessel, Builder shall launch, commission, and conduct Dock Trials of the Vessel at Builder's cost and expense to demonstrate that the Work and all the Vessel's machinery, equipment and systems operate in accordance with the Contract Documents.

(c)     *Sea Trials*.   Upon satisfactory completion of Dock Trials, and satisfactory correction of any defective or non-compliant Work, Builder shall take the Vessel on Sea Trials immediately prior to its intended delivery to Owner to demonstrate that the Vessel and its machinery, equipment, and systems operate satisfactorily while the Vessel is in service and that Builder has constructed the Vessel in accordance with the Contract Documents and all applicable requirements of the Regulatory Authorities.

(d)     *Notice of Trials*.   Builder shall give Owner not less than seven (7) Days' advance written notice of the scheduled dates for Trials.

(e)     *Owner Attendance at Trials*.   Owner shall have the right to have a reasonable number of authorized representatives present at Dock Trials and Sea Trials, not to exceed fifteen (15) persons, unless otherwise agreed.  Builder may, after due notice as described above, conduct Dock Trials and Sea Trials without the

- 40 -

presence of the Owner's Representative or other authorized representative of Owner, provided that the Classification Society and the Coast Guard are present. If Owner fails to attend Dock Trials or Sea Trials, Owner shall be obligated to accept the results of such Trials on the basis of a certificate of Builder, confirmed by the Classification Society and the Coast Guard, stating the results of such Trials.

(f)     *Locations of Trials*. Builder shall secure any space necessary to carry out the Trials and operate any system of the Vessel as required herein.

(g)     *Weather During Sea Trials*. Sea Trials shall be carried out under weather conditions deemed favorable enough in the judgment of Builder, subject to approval by Owner. In the event of unacceptable weather on a date specified for Sea Trials, Builder shall conduct such Sea Trials on the first available day thereafter with suitable weather. If the weather during Sea Trials should become unacceptable and preclude the continuation of Sea Trials, then Sea Trials may be discontinued and resumed on the first favorable day thereafter, unless Owner agrees in writing to accept the Vessel on the basis of the Sea Trials conducted before such discontinuance. Any delay in Sea Trials caused by unacceptable weather shall be deemed a Permissible Delay pursuant to Article 16.

(h)     *Conduct of Sea Trials*. All expenses in connection with Sea Trials are for the account of Builder and Builder shall provide at its own expense the necessary crew to comply with conditions of safe navigation. Sea Trials shall be conducted in the manner prescribed in the Specifications, and shall prove fulfillment of the performance requirements for Sea Trials as set forth in the Specifications. The course of Sea Trials shall be determined by Builder.

(i)     *Preservation of Obligations*. The foregoing shall be without limitation or relief of any of Builder's obligations under this Agreement.

13.2     System Tests.

(a)     *Retained Amount Pending System Tests*. The Parties recognize that the Vessel's rock placement system ("*Mission System*") can only be effectively tested by loading a quantity of rock material into the Vessel's holds, transporting rocks from the holds to the fall pipe system, and discharging the rocks through the fall pipe system, and that such testing cannot be completed until after the time of Delivery when the Vessel has commenced work on its first rock placement project. Accordingly, Owner shall withhold from the

- 41 -

Delivery Payment the sum of FIVE HUNDRED THOUSAND U.S. DOLLARS ($500,000) (the "*Retained Amount*") until such time as the Mission System has been tested (such tests, the "*System Tests*") and has been determined to have been installed by Builder in accordance with the Specifications. Owner agrees that the System Tests will be performed no later than three (3) months following Delivery (excluding time lost due to warranty issues for which Builder is responsible). If the System Tests are not performed within such time, the Retained Amount shall be released, and any deficiencies in the installation of the Mission System shall be treated as a Warranty Defect under Article 14.

(b)     *Notice of System Tests*. Owner shall give Builder not less than three (3) Days' notice of the scheduled date for the System Tests, and Builder shall have the right to attend the System Tests. Owner shall notify Builder of the results of the System Tests and of any defects in the installation of the Mission System within twenty (20) Days of the date of completion of the System Tests. If Owner does not notify Builder of a defect in the installation of the Mission System within such time, Owner shall pay the Retained Amount to Builder.

(c)     *In the Event of Defects Found During System Tests*. If Owner notifies Builder of any defects in the installation of the Mission System discovered during the System Tests, Builder (with Owner's reasonable cooperation) shall remedy such defects as soon as possible in accordance with Article 14. The period of time required for such repairs shall count as a delivery delay for purposes of determining liquidated damages payable to Owner pursuant to Article 17; provided, however, that in no event shall (i) the liquidated damages attributable to such defects in the installation of the Mission System discovered during the System Tests exceed the Retained Amount; (ii) the total liquidated damages exceed the maximum liquidated damages set forth in Section 17.7; or (iii) the period of time required for such repairs count as a delivery delay for purposes of determining Owner's termination right pursuant to Section 17.9. Upon satisfactory remediation of defects in the installation of the Mission System by Builder, Owner shall pay the Retained Amount to Builder, less any amount of liquidated damages incurred as a result of the Mission System installation repair delay. Builder shall not be responsible for the quality, efficiency, and/or performance of the Mission System except for its proper installation.

13.3     <u>Regulatory Examinations During Trials</u>. During any Trials, the Vessel may be examined or inspected by the Regulatory Authorities, Builder and Owner.

13.4　　　Owner Notice of Complaint Concerning Completion of Work.  Owner shall notify Builder of any complaint as to the satisfactory completion of the Work promptly, and in any event within two (2) Working Days after conclusion of each Trial.  Such notice shall be in writing and shall set forth the nature and character of the complaint in sufficient detail to fully apprise Builder of the basis of the complaint.  If Builder agrees that Owner has a valid complaint as to the unsatisfactory completion of the Work, Builder shall resolve the complaint so that the Work conforms with the Contract Documents.  When the inspection is complete and complaints, if any, are satisfactorily resolved, the Work and the Vessel will be complete and accepted in writing by Owner, subject to Owner's warranty rights under Article 14.

13.5　　　Builder Dispute of Complaint.  If Builder disputes a complaint, the Parties shall seek to resolve the dispute through good faith discussions between the Parties.  If such good faith discussions fail to resolve the issue, then the Parties shall resolve the matter in accordance with Article 27 of this Agreement.

13.6　　　Actions Pending Dispute Resolution.  During the pendency of any such dispute, Owner shall have the right to give written direction to Builder to resolve Owner's complaint as directed by Owner.  Upon such direction from Owner, Builder shall perform all Work necessary to resolve Owner's complaint in accordance with such written direction, and Owner shall provisionally pay Builder for such Work on a time and material basis as set forth in Section 10.8 and the Delivery Date for the Vessel shall be provisionally adjusted by the number of Days of the Work required by the compliance with Owner's written direction.  If the resolution of the dispute determines that the disputed Work was not required by the Contract Documents, then such Work shall be deemed to have not been part of the Contract Price and Builder shall be entitled to retain such payment and the adjustment of the Delivery Date shall be deemed final.

13.7　　　Builder to Reimburse if Complaint Sustained.  If the resolution of the dispute determines that the disputed Work was required by the Contract Documents, then such Work shall be deemed to have been part of the Contract Price and Builder shall be deemed to have been required to correct such Work at Builder's sole cost and expense, including costs of such additional testing and Trials as may have been required to complete such Work in accordance with the Contract Documents.  In such case, Builder shall reimburse Owner for all such correction costs previously paid to Builder and pay any liquidated damages for delay for each Day by which the delivery of the Vessel was delayed past the Delivery Date.

13.8　　　Shipyard Contract Deficiency Report.  Owner may provide to Builder a Shipyard Contract Deficiency Report in the form of Exhibit K as a means to communicate items that need to be addressed by Builder before Delivery and Acceptance.

- 43 -

13.9       <u>Tender for Delivery, Punchlist</u>.  When the Vessel is tendered for delivery by Builder, Owner shall not reject the Vessel for minor non-conformities due to bad workmanship, use of defective Materials or failure to build the Vessel strictly in accordance with the Specifications and Contract Drawings, where such minor non-conformities do not make the Vessel unsuited to the service for which it was ordered and cannot reasonably be expected to affect the approval of the Vessel by Regulatory Authorities or the safety and operational activity of the Vessel, at Owner's reasonable discretion (such minor non-conformities, "<u>*Minor Non-Conformities*</u>").  Owner shall provide Builder with a listing of the Minor Non-Conformities prior to Delivery or as soon as possible thereafter.

13.10      <u>Remedy of Minor Non-Conformities</u>.  Builder shall undertake in writing to remedy such Minor Non-Conformities as soon as possible and within the Warranty Period.  Builder and Owner shall jointly schedule the correction of such remaining Minor Non-Conformities, to be completed as soon as possible.  The value of such remaining Minor Non-Conformities may be negotiated by the Parties and may be reserved from the Delivery Payment, at Owner's option, pending satisfactory resolution of such Minor Non-Conformities.

13.11      <u>Material Non-Conformities</u>.  Builder shall promptly correct all non-conformities other than Minor Non-Conformities (such other non-conformities, "<u>*Material Non-Conformities*</u>") and shall advise Owner of such completion.  Owner shall have the opportunity to inspect the Vessel and confirm the correction of Material Non-Conformities prior to accepting the Vessel.

13.12      <u>Delivery</u>.  When Builder has corrected all Material Non-Conformities and provided a written undertaking to correct Minor Non-Conformities in accordance with Section 13.10, Owner shall make the Delivery Payment in full as specified in Exhibit M. and shall sign and deliver a Protocol of Delivery and Acceptance, whereupon Builder shall deliver to Owner, at the Shipyard or such other location as mutually agreed, title and possession to the Vessel free and clear of all Liens and encumbrances, excluding any Liens or encumbrances created or suffered to be created by or through Owner or any of its Affiliates or any of their subcontractors or suppliers, together with certificates and documents required pursuant to Section 13.13.

13.13      <u>Certificates Due at Delivery</u>.  Not later than the time of Delivery of Vessel, Builder shall execute and/or deliver to Owner the following certifications and other documentation:

    (a)   A Builder's Certificate in the form of Coast Guard form CG-1261, in form and content as may be required to obtain Vessel documentation with a United States coastwise trade endorsement;

    (b)   a Certificate of Completion and Delivery in the form of Exhibit E (including the documents listed therein as the Parties agree) stating:

- 44 -

(i)    that the Vessel has been completed, subject to Minor Non-Conformities;

(ii)   that all Trials and tests have been satisfactorily completed; and

(iii)  that the Vessel complies with the Contract Documents and is free from known defects in Builder's Materials and workmanship;

(c)    final Lien Releases from Builder, in the form of Exhibit D-1;

(d)    the Detailed Design documentation pertaining to the Vessel as stipulated in the Specifications together with all drawings required to be submitted to Regulatory Authorities (in a native format or as otherwise agreed);

(e)    a Protocol of Delivery and Acceptance in the form set forth in Exhibit I and signed by Builder;

(f)    any other documents set forth in the Specifications; and

(g)    any other documents required by applicable law or by any Regulatory Authority for Owner to have the Vessel documented in Owner's name and to enable the Vessel to commence operations as a subsea rock installation vessel, inspected under 46 C.F.R. Subchapters I and L, with a United States coastwise trade endorsement (subject to Owner's qualification therefor), or as may otherwise reasonably be required by Owner (the foregoing documents collectively referred to as the "_Delivery Documents_").

13.14    Documentation of Completed Vessel.  Owner shall be solely responsible for filing its application for documentation of the Vessel under the United States flag.  Owner shall file a provisional application for documentation within sixty (60) days of keel-laying of the Vessel, and shall provide to Builder the United States Official Number for the Vessel upon receipt from the Coast Guard.

13.15    Obligation of Delivery.  Builder shall deliver the Vessel to Owner in accordance with this Agreement on or before the Delivery Date, free and clear of Liens as required by Section 4.6.

13.16    Location of Delivery.  Delivery shall be made safely afloat at the Shipyard in Philadelphia, PA, or at a location mutually agreed by Owner and Builder.  If Delivery is made at an offshore location, the costs of such offshore delivery will be the subject of a Change Order for the account of Owner.

- 45 -

13.17    <u>Effective Date of Delivery</u>.  The date on which Owner delivers the Protocol of Delivery and Acceptance and Builder delivers the documents required by this Article shall be the date of Delivery for purposes of the start of the Warranty Period and the assumption of risk of loss of the Vessel by Owner.

13.18    <u>Additional Work</u>.  Owner may also identify additional work and request Builder to provide estimates for such additional work.  Such additional work shall be handled separately from the correction of Minor Non-Conformities and shall be considered service requests.   Any additional work requested by Owner and agreed by Builder shall not delay Owner from accepting the completion of the Vessel by execution of a Protocol of Delivery and Acceptance in substantial conformity with the form set forth as Exhibit I and shall not excuse or delay any payments due to Builder under this Agreement, except as otherwise agreed in writing by the Parties.

13.19    <u>Failure of Owner to Take Delivery</u>.  If Owner: (i) does not undertake final inspection within ten (10) Days' of notice from Builder of satisfactory completion of Trials, or (ii) wrongfully refuses to accept Delivery within ten (10) Days' of completion of a final inspection (including correction by Builder of identified Material Non-Conformities, if any) by failing to make the Delivery Payment, failing to sign the Protocol of Delivery and Acceptance, or otherwise, then, in addition to Builder's other rights and remedies hereunder, Owner shall assume responsibility for payment of (or reimburse Builder promptly for) all reasonable charges incurred by Builder relating to the insurance, storage, and maintenance of the Vessel at Builder's Shipyard, pending completion of the Delivery process.

13.20    <u>Delivery Dispute</u>.  In the event of a dispute between the Parties as to the condition of the Vessel for Delivery or the obligation of Owner to accept Delivery, all charges relating to the insurance, storage or maintenance of the Vessel during the dispute will be paid by Builder, with final responsibility for such costs to be determined by good faith discussion, mediation, and/or arbitration as provided in Article 27.

13.21    <u>Removal of the Vessel</u>.  Owner shall take possession of the Vessel immediately upon acceptance of Delivery.  Owner shall remove the Vessel from the Shipyard within seven (7) Days of the Vessel receiving its Certificate of Inspection (whether temporary or permanent) from the Coast Guard.  Such period shall be extended as necessary if sailing of the Vessel is delayed due to weather conditions, including storms or ice conditions.  Regardless of any such delay, Owner shall assume responsibility for payment of (or reimburse Builder promptly for) all reasonable charges incurred by Builder relating to the dockage of the Vessel at Builder's Shipyard. Owner shall in any event remove the Vessel from the Shipyard within twenty-one (21) Days following acceptance of Delivery.

be its sole and exclusive remedy and the provisions of Article 18 shall not apply and the termination shall not be deemed to be on account of a Builder default.  Upon such termination and payment by Owner to Builder of the amounts required under Subsection (c), the Parties shall execute and deliver a mutual release of all obligations under this Agreement relating to the Vessel, except for those that this Agreement provides shall survive termination.

16.13    Delayed Delivery of Owner Furnished Information.  A delay due to the delayed delivery of necessary Owner-supplied information or documents shall not constitute a Permissible Delay unless: (i) Builder timely informed Owner of the need for such information or documents pursuant to Sections 8.3(f)and 8.10(c) and as otherwise reasonable; and (ii) the delayed delivery causes an actual delay in the progress of the Work that could not be avoided by the exercise of reasonable judgment by Builder.  The extent of such Permissible Delay shall be only to the extent of its actual impact on the Progress of the Work.  In the event that Builder claims that a delayed delivery should constitute a Permissible Delay, the Parties shall evaluate such claim in accordance with the procedures set out in Sections 16.8 through 16.10, *mutatis mutandis.*

16.14    COVID-19.  The Parties acknowledge the current world events surrounding the COVID-19 pandemic and agree that any act, event, or circumstance related to the COVID-19 pandemic otherwise meeting the definition of an event of Force Majeure under Section 16.2 is not excepted from that definition because of the duration and nature of the pandemic.  Such COVID-19 events may include, without limitation, labor shortages resulting from the COVID-19 federal vaccine mandates, subject to Section 16.6.

16.15    NSMV Contracts.  Builder advises that it has contracts committing Builder to construct four National Security Multi-Mission Vessels (the "*NSMV Contracts*") and has granted an option under the NSMV Contracts for the construction of NSMV-5.  Builder advises that the Delivery Date for the Vessel is being committed taking into account Builder's obligations under the NSMV Contracts and the NSMV-5 option.  Builder agrees that its obligations under the NSMV Contracts and the NSMV-5 option and any delay in its deliveries under the NSMV Contracts and the NSMV-5 option would not constitute a Permissible Delay or a Force Majeure event unless all of the conditions (a), (b) and (c) of Section 16.2 are satisfied.

## Article 17   EARLY DELIVERY BONUS, LIQUIDATED DAMAGES FOR DELAY

17.1    Early Delivery Bonus.  In the event Builder shall deliver the Vessel earlier than the Delivery Date, the Contract Price for the Vessel shall be increased in the amount of ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000) per Day for each and every Day by which

the actual date of Delivery for the Vessel precedes the Delivery Date, up to a maximum increase of EIGHT MILLION U.S. DOLLARS ($8,000,000).

17.2     Grace Period.  Builder shall not be responsible for liquidated damages for the first fifteen (15) Days of delay of the delivery of the Vessel beyond the Delivery Date (such period of time, the "*Grace Period*").

17.3     16-30 Days Late Delivery.  If Builder shall deliver the Vessel later than fifteen (15) Days after the Delivery Date, then Builder shall pay to Owner as liquidated damages in the form of a reduction in the Contract Price, to the extent any amounts are still owing, and any balance in cash, the amount of THIRTY THOUSAND DOLLARS ($30,000) per Day for each and every Day that the actual date of Delivery for the Vessel occurs later than fifteen (15) Days after the Delivery Date, up to thirty (30) Days of delay.

17.4     31-45 Days Late Delivery.  If Builder shall deliver the Vessel later than thirty (30) Days after the Delivery Date, then Builder shall pay to Owner as liquidated damages in the form of a reduction in the Contract Price, to the extent any amounts are still owing, and any balance in cash, the amount of SIXTY THOUSAND DOLLARS ($60,000) per Day for each and every Day that the actual date of Delivery of the Vessel occurs later than thirty (30) Days after the Delivery Date, up to forty-five (45) Days of delay.  Any amount payable as liquidated damages under this Section 17.4 shall be in addition to the liquidated damages payable under Section 17.3.

17.5     46-60 Days Late Delivery.  If Builder shall deliver the Vessel later than forty-five (45) Days after the Delivery Date, then Builder shall pay to Owner as liquidated damages in the form of a reduction in the Contract Price, to the extent any amounts are still owing, and any balance in cash, the amount of NINETY THOUSAND DOLLARS ($90,000) per Day for each and every Day that the actual date of Delivery of the Vessel occurs later than forty-five (45) Days after the Delivery Date, up to sixty (60) Days of delay.  Any amount payable as liquidated damages under this Section 17.5 shall be in addition to the liquidated damages payable under Sections 17.3 and 17.4.

17.6     61 or More Days Late Delivery.  If Builder shall deliver the Vessel later than sixty (60) Days after the Delivery Date, Builder shall pay to Owner as liquidated damages in the form of a reduction in the Contract Price, to the extent any amounts are still owing, and any balance in cash, the amount of ONE HUNDRED AND TWENTY THOUSAND DOLLARS ($120,000) per Day for each and every Day that the actual date of Delivery for the Vessel occurs later than sixty (60) Days after the Delivery Date.  Any amount payable as liquidated damages under this Section 17.6 shall be in addition to the liquidated damages payable under Sections 17.3, 17.4, and 17.5.

17.7        <u>Maximum Liquidated Damages</u>.  ==In no event shall Builder's aggregate liability for liquidated damages under this Article exceed EIGHT MILLION DOLLARS ($8,000,000).==

17.8        <u>Agreement to Liquidated Damages</u>.  The Parties agree that in the event of late Delivery of the Vessel, Owner shall suffer damages that are difficult to ascertain, and the Parties acknowledge and agree that liquidated damages in the amounts set forth herein are a reasonable estimate of the anticipated damages that Owner may suffer as a result of delayed Delivery and are not a penalty.  It is understood and agreed by and between Builder and Owner that such reduction in the Contract Price for the liquidated damages or payment of any balance in cash shall be in lieu of all other delay damages available to Owner for the late Delivery of the Vessel under this Agreement or at law or in equity (except for the injunctive relief set forth Sections 9.4(d) and 27.12, if any, and shall be construed as liquidated damages and as a waiver of any rights or remedies otherwise available for the failure to timely complete the Vessel on or before the Delivery Date as such may be adjusted.  Notwithstanding the foregoing, Owner specifically reserves its equitable remedies for injunctive relief as contemplated by Sections 9.4(d) and 27.12.  Liquidated damages shall cease to accrue at such time that Builder tenders Delivery to Owner of the Vessel if construction of the Vessel is fully completed in accordance with the Contract Documents except for Minor Non-Conformities.

17.9        <u>Owner's Right to Terminate for Late Delivery</u>.

(a)    *Owner's Right to Terminate for Late Delivery*.  In the event Builder shall not have delivered the Vessel on or before one hundred and five (105) Days after the Delivery Date, Builder shall be in default under this Agreement and in addition to the liquidated damages due, Owner may at its option terminate this Agreement pursuant to Section 18.2.

(b)    *Builder's Right to Notice of Owner's Election*.  At any time after Owner's right to terminate this Agreement accrues under Subsection (a), Builder may request in writing that Owner make an election whether to exercise its rights under Subsection (a).  Owner shall, within fifteen (15) Days after receipt of such a request, respond to Builder in writing electing one of the following options: (i) to terminate this Agreement, or (ii) to consent to accept delivery of the Vessel at an agreed specific future date; it being understood and agreed by the Parties that if the Vessel is not delivered by such date, then Owner shall have the right to immediate termination of this Agreement thereafter pursuant to Subsection (a).

22.6         <u>Actions in Event of Finding of Infringement</u>.  If in any such suit so defended, all or any part of the Work (or any design element, component, equipment or Material thereof) that is supplied by a Party is held to constitute an infringement or violation of any third party's intellectual property rights and is enjoined, or if in respect of any claim of infringement such Party deems it advisable to do so, such Party shall at its sole option and absolute discretion take one or more of the following actions at no additional cost to the other Party: (a) procure the right to continue the use of the same without material interruption for the other Party or (b) take back the infringing design element, component, equipment or Material and replace it with non-infringing design element, component, equipment or Material acceptable to the other Party at no additional cost to the other Party.

## <u>Article 23</u>   <u>NOTICES AND COMMUNICATIONS</u>

23.1         <u>Means of Notice</u>.  Any notices required or permitted to be given pursuant to this Agreement shall be given in writing and delivered by either United States certified mail (express delivery with signed receipt), courier service with signed receipt on delivery, hand delivery with signed receipt, or electronic mail if receipt of such communication is confirmed in writing or by electronic mail from all "to" addressees.  A notice shall be effective upon delivery.

23.2         <u>Contact Details</u>.  Notices hereunder shall be sent to the following Persons:

If to Owner:

> GREAT LAKES DREDGE & DOCK, LLC.
> 9811 Katy Freeway
> Suite 1200
> Houston, Texas  77024
> Attention: Stephanie Espinoza
>          Assistant General Counsel – Dredging Division
> Telephone: + (346) 359-1120
> Email: saespinoza@gldd.com

with a copy to (which shall not constitute notice):

> H. Allen Black III
> Mills Black LLP
> 1215 19th Street, NW
> Washington, DC  20036
> Telephone:  + (202) 467-4182
> Email: hablack@millsblack.com

- 74 -

If to Builder:

        PHILLY SHIPYARD, INC.
        2100 Kitty Hawk Avenue
        Philadelphia, PA 19112
        Attention: Dean E. Grabelle
        Title: –SVP & General Counsel
        Telephone: 215-875-2687
        Email: dean.grabelle@phillyshipyard.com

    with copy to (which shall not constitute notice):

        R. Anthony Salgado
        Blank Rome LLP
        International Square Building
        1825 I Street, N.W.
        Washington, D.C. 20006-5403

        Telephone: 202-772-5948
        Email:  tony.salgado@blankrome.com

23.3        <u>Authorized Signatories for Changes</u>.  Notwithstanding any other provision of this Agreement, all final authorizations and agreements concerning deductions from, additions to, or modifications of the Vessel's design or Specifications or any agreements that concern changes in the Delivery Date of the Vessel and/or Contract Price shall not be valid or binding on either Party unless signed by one of the below designated representatives for each Party or their respective successors in office:

        OWNER:     David Simonelli, Chief Operating Officer

        BUILDER:   Ray Staton, Project Manager

23.4        <u>Availability for Consultation</u>.  Each Party agrees that at least one of its designated representatives will be available for consultation during normal working hours.  The Parties further agree that a Party may change its above-designated representatives upon ten (10) Working Days' prior written notice.

### Article 24   TITLE, SECURITY, AND WARRANTY OF TITLE

24.1        <u>Progressive Vesting of Title to Vessel</u>.  Title in and to the Vessel as it is constructed shall progressively vest, and once vested shall in all events remain, in Owner, not Builder, as the Vessel is constructed.  Owner's title shall not extend to any scrap or surplus materials resulting from the Work, title to which shall remain in Builder.

26.2      <u>Approval Disputes</u>.  Any dispute between the Parties regarding the fitness of the design, plans, or construction of the Vessel, its machinery and equipment, and/or regarding the Materials and/or workmanship with regard to satisfaction of Classification Society Rules or Regulatory Agency requirements (such disputes, "*Approval Disputes*") shall be determined by the Classification Society (acting with or by its assigned surveyor).  The decision of the Classification Society as to such matters shall be final, conclusive, and binding upon the Parties.  In the event that the Classification Society will not determine such disputes, such disputes shall be determined by a jointly appointed surveyor (the "*Joint Surveyor*"), in which case the decision of the Joint Surveyor as to such matters shall be final, conclusive, and binding upon the Parties.  In the event that the Parties cannot agree upon a Joint Surveyor, a Joint Surveyor will be appointed by arbitrators appointed for that purpose in accordance with Article 27.

26.3      <u>Technical Disputes</u>.      Any other dispute regarding the Materials and/or workmanship in connection with the Vessel, including interpretations of the Specifications (such disputes, "*Technical Disputes*"), shall be referred to the Joint Surveyor.  The decision of the Joint Surveyor as to such matters shall be final, conclusive, and binding upon the Parties.

26.4      <u>Award of Costs of Approval Disputes or Technical Disputes</u>.  The costs of resolving any Approval Dispute or Technical Dispute, including Classification Society charges, Joint Surveyor charges, and delays due to such dispute, shall be for the account of the non-prevailing Party.  In the event that both Parties prevail in part, the costs shall be split equally.

## Article 27   DISPUTE RESOLUTION AND LIMITATIONS PERIOD

27.1      <u>Approval and Technical Disputes</u>.  Approval Disputes and Technical Disputes shall be resolved in accordance with Article 26.  Any dispute arising under or related to this Agreement not resolved pursuant to Article 26 shall be resolved in accordance with this Article.

27.2      <u>Best Efforts to Settle Differences</u>.  If any dispute or controversy between the Parties arises out of or in connection with this Agreement, the Parties agree that they shall use their best efforts to settle their differences by good faith consultations and discussions.

27.3      <u>Mediation</u>.  If the Parties are unable to resolve the dispute within thirty (30) Days, or such longer period as they mutually agree, either Party may call for mediation of the dispute, with such mediation to be held in New York, New York or such other location as may be mutually agreed, using a disinterested mediator agreeable to both Parties, with the cost of such mediation shared equally by both Parties.

27.4      <u>Arbitration</u>.  Any dispute not otherwise resolved by mediation shall be settled by binding arbitration under the Rules of the Society of Maritime Arbitrators, Inc. (the "*SMA Rules*")

except as modified below or as otherwise agreed by the Parties, with such arbitration to be held in New York, New York or such other location as may be mutually agreed.

27.5     <u>Time Limit for Notice of Claims</u>.  Except for warranty claims subject to the notification requirements set forth in Article 14, notice of any claim for relief of either Party against the other for breach of any obligation or duty arising under this Agreement or relating to the subject matter of this Agreement shall be given within three (3) years after Delivery of the final Vessel under this Agreement.  Failure to bring such claims within such period shall result in such claims being barred and forever waived.

27.6     <u>Commencement of Arbitration</u>.  Arbitration shall be commenced by either Party by written notice (a "*Notice of Arbitration*") to the other Party within thirty (30) Days after mediation is conclusively terminated.  Such Notice of Arbitration shall state the issue to be arbitrated and identify the Party's appointed arbitrator.

27.7     <u>Response to Notice of Arbitration</u>.  The other Party shall, by written notice within fifteen (15) Days after receipt of the Notice of Arbitration, appoint a second arbitrator.  If the other Party shall fail to appoint a second arbitrator within that time period, the first appointed arbitrator shall serve as sole arbitrator of the dispute.  If the other Party does timely appoint a second arbitrator, the two Party-appointed arbitrators shall select a third arbitrator in accordance with the SMA Rules.  The Party-appointed arbitrators shall jointly provide a written notice of the selection of the third arbitrator to both Parties within five (5) Days after such selection.  The selected third arbitrator shall serve as chairman of the arbitration panel.  The arbitration panel shall hold an arbitration hearing within thirty (30) Days after the appointment of the third arbitrator.

27.8     <u>Qualifications of the Arbitrators</u>.

     (a)     An arbitrator may not have any direct or indirect financial or personal interest in the outcome of the arbitration.

     (b)     An arbitrator may not have acquired from an interested source detailed prior knowledge of the matter in dispute.

     (c)     An arbitrator may not have any close personal ties or business relations with any one of the Parties to the arbitration, any Affiliate or associated companies of either of the Parties, any counsel for either of the Parties, or any immediate family members of the foregoing Persons.

     (d)     An arbitrator need not be a member of the Society of Maritime Arbitrators, Inc., but must have familiarity with vessel construction issues.

27.9        <u>Conduct of the Arbitration</u>.  To the extent permitted by the SMA Rules and the arbitrators, any arbitration under this Agreement shall be conducted as follows:

(a)       *Expedited Proceedings*.  Because time is of the essence under this Agreement, the arbitrators shall be requested to undertake proceedings on an expedited basis so that a prompt decision of the question or questions can be announced by the arbitrators to the Parties.  The Parties shall use their reasonable best efforts to have the arbitral proceeding concluded and an award rendered by the arbitrator(s) within forty-five (45) days of the initiation of the arbitration proceeding.

(b)       *Discovery*.  Upon the selection of the arbitrators, each of the Parties shall be entitled to commence reasonable discovery through exchange of documents and requests for admissions, subject to the sole discretion of the arbitrators.

(c)       *Claims of $100,000 or Less*.  Notwithstanding anything in this VCA to the contrary, any dispute relating to claims of $100,000 or less in the aggregate shall be governed by the Shortened Arbitration Procedure of the SMA Rules.

27.10       <u>Arbitration Award</u>.  The arbitration panel shall render a reasoned award including a provision for payment of costs and expenses of arbitration to be paid by one or more of the Parties hereto, as the arbitration panel deems just.  The arbitrators shall be entitled to award interest, but shall not be entitled to award indirect, punitive, incidental, consequential, or exemplary damages of any kind or nature.  In the event of any arbitration award rendered prior to Delivery of the Vessel, the award shall include a finding as to whether or not the Delivery Date of the Vessel is in any way altered thereby.  The decision of the arbitration panel shall be final and binding on the Parties hereto, and judgment may be entered thereon in any court having jurisdiction.

27.11       <u>Confidentiality of Arbitration Awards</u>.  Notwithstanding any contrary provisions in the SMA Rules, the arbitration award shall be withheld from publication.

27.12       <u>Right to Equitable and Provisional Relief</u>.  Nothing in this Article shall be deemed to limit or otherwise restrict the right of either Party to seek injunctive or other equitable relief in any court of competent jurisdiction or to seek provisional relief from any court of competent jurisdiction to preserve their respective rights pending arbitration, and in seeking such relief shall not waive the right of arbitration.

## Article 28    PUBLICITY AND DISCLOSURES.

28.1        Use of Photographs.  Subject to Owner's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed, Builder may use photographs of the Vessel during construction and following Delivery in its promotional materials.

28.2        Cooperation with Regard to Marketing Activities.  Without limitation to the foregoing and subject to the Parties' respective intellectual property rights and business activities, the Parties agree to cooperate with regard to the marketing of the Vessel, including hosting of representatives of trade publications, appearances at public events, and similar activities and events.  Nothing herein is intended to require either Party to forego business activities or incur uncompensated expenses for the purposes of marketing activities.

## Article 29    AUDITS

29.1        Limited Audit Rights.  Owner shall have the limited right to audit the construction, procurement, and accounting records related to the construction of the Vessel under this Agreement as may be reasonably necessary to enforce or protect Owner's rights under this Agreement with regard to claimed escalation or as otherwise permitted herein.  Builder shall not be required to provide pricing information except in connection with claims by either Party including or based upon such pricing information.

29.2        Terms of Audit Rights.  Such audits shall be conducted at Owner's expense and upon reasonable notice and upon reasonable terms and conditions.

## Article 30    MISCELLANEOUS

30.1        Entire Agreement.  This Agreement, which includes the Exhibits listed below, all duly executed Change Orders (if any), and amendments or modifications to any of the foregoing or to this Agreement, constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes any and all other prior promises, correspondence, agreements, discussions, representations, and understandings, whether oral or written.  No other agreements, promises, correspondence, discussions, representations, or understandings, either express or implied, unless expressly set forth herein, are binding between the Parties.

30.2        Due Authority.  Each Party represents and warrants that its execution of this Agreement is duly authorized by all necessary corporate actions and resolutions.

30.3        Binding Affect.  This Agreement shall be binding on and inure to the benefit of the Parties and their heirs, legal representatives, executors, successors, and permitted assigns.

- 84 -

30.4        No Waivers.  Except with respect to the time limitations set forth in Article 14 and Article 27 concerning warranty claims and dispute resolution procedures, no delay or omission on the part of either Party in exercising or enforcing any right hereunder shall operate or be construed as a waiver or bar to enforcement of such right on that occasion or on any other or future occasion, or a waiver or bar to enforcement of any other right or future right of a Party hereunder on any other or future occasion.

30.5        Severability.   Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

30.6        Headings.  The headings in this Agreement are inserted for convenience only and are not to be considered in the construction or interpretation of the provisions of this Agreement.

30.7        Modification.  No amendment, change or modification of this Agreement shall be valid unless in writing and signed by the Party against whom such amendment, change or modification is sought to be enforced.

30.8        Drafting.  This Agreement has been drafted and negotiated by both Parties, each with advice of counsel.  For purposes of interpretation and enforcement, this Agreement shall be considered to have been drafted jointly by the Parties.

30.9        Duplicate Originals.  This Agreement may be executed in duplicate originals and any true and complete copy shall be deemed an original for any purpose in which an original might otherwise be required.

30.10       Counterparts.  This Agreement may be executed in counterparts, each of which shall be effective only upon delivery to the other Party, and each of which shall be taken to be one and the same Agreement as if all the Parties had signed the same Agreement.  The Parties may manually execute this Agreement, but each Party agrees that a facsimile, PDF, or other electronic transmission of such signature shall be deemed binding on each Party, and the Parties agree not to contest the validity of this Agreement by reason of the fact that a manually executed copy has not been delivered.

30.11       Governing Law.  This Agreement and any disputes arising in connection herewith shall be governed, without consideration of conflicts of law, by and construed in accordance with the laws of the State of New York.  In no event shall this Agreement be subject to or interpreted in accordance with the United Nations Convention on Contracts for the International Sale of Goods.

30.12        Confidentiality.

(a)    The Parties acknowledge and agree that certain information relating to each of them that may be disclosed to or otherwise acquired by the other in connection with this Agreement and the negotiations leading up to its execution by the Parties, may constitute material, confidential, and non-public information, which shall be governed by the Confidentiality Agreement.  To the extent of any conflict between this Agreement and the Confidentiality Agreement, this Agreement will govern.

(b)    Except to the extent required by law, neither Party will make any announcement or disclosure of the fact that such discussions have occurred, or of the terms of this Agreement without the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Each Party shall be permitted to make press releases or other disclosures as may be required by law in the reasonable opinion of each Party's Securities Counsel upon advance written notice to the other Party.

(d)    Notwithstanding anything to the contrary in the Confidentiality Agreement, the Parties agree that (i) Confidential Information (as defined in the Confidentiality Agreement) of Owner may be disclosed by Builder to third parties as may be required for the design and construction of the Vessel; and (ii) Confidential Information of Builder may be retained and copied by Owner or any transferees of the Vessel for the life of the Vessel and may be disclosed by such parties to third parties as may be required in connection with the design, operation, repair, modification, chartering, insuring, financing, and sale of the Vessel; provided that in each case Builder or Owner or such transferee enters into a confidentiality agreement providing substantially the same protections as in the Confidentiality Agreement and this Section 30.12.

(e)    In the event that this Agreement remains in effect later than February 2026, the Parties agree to extend the Confidentiality Agreement through the termination of this Agreement.

(f)    The foregoing confidentiality provisions shall survive the completion, termination, or expiration of this Agreement.

*Execution Follows:*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their proper authorized representatives, thereunto duly authorized.

**BUILDER**
PHILLY SHIPYARD, INC.

Dated: 11/15/2021

Name:     Steinar Nerbovik
Title:     President & Chief Executive Officer

**OWNER**
GREAT LAKES DREDGE & DOCK COMPANY, LLC

Dated: _____

Name:     Lasse Petterson
Title:     Chief Executive Officer & President

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their proper authorized representatives, thereunto duly authorized.

**BUILDER**
PHILLY SHIPYARD, INC.

Dated: _____

_____
Name:      Steinar Nerbovik
Title:      President & Chief Executive Officer

**OWNER**
GREAT LAKES DREDGE & DOCK COMPANY, LLC

Dated: ___Nov 15 2021___

_____
Name:      Lasse Petterson
Title:      Chief Executive Officer & President

**SCHEDULE X**

**DEFINITIONS**

Capitalized terms used in this Agreement shall have the meanings set out below. Terms not defined in this Schedule X or otherwise in this Agreement shall have their common meanings.

"**Affiliates**" means for purposes of this Agreement any entity that controls, is controlled by, or is under common control with another entity. An entity is deemed to control another if it owns directly or indirectly at least fifty percent (50%) of (i) the shares entitled to vote at a general election of directors of such other entity, or (ii) the voting interest in such other entity if such other entity does not have either shares or directors.

"**Agreement**" has the meaning defined in the Preamble.

"**Alternative Compliance Program**" or "**ACP**" means the Coast Guard program authorizing certain organizations, including the Classification Society, to carry out certain vessel plan review and inspection activities on behalf of the Coast Guard, pursuant to 46 U.S.C. § 3316 and 46 CFR part 8, subpart D, §§ 8.400 et seq.

"**Announced Regulatory Amendment**" shall mean an announcement by a Regulatory Authority of an upcoming change in a rule or regulation applicable to the Vessel that has an established effective date and has been publicly promulgated by means of a Circular issued by the IMO or an IMO Committee, or similar announcement from the Classification Society, or a Final Rule issued by a Regulatory Authority.

"**Approval Disputes**" has the meaning defined in Section 26.2.

"**Base Rates**" has the meaning defined in Section 3.4(f).

"**Basic Design**" means the design of a subsea rock installation vessel, as further described and specified in the Specifications and other Contract Documents and shall include all documents embodying such design and all Intellectual Property embodied in such design documents, as specified in the Contract Documents and detailed in Exhibit P.

"**Builder**" has the meaning defined in the Preamble.

"**Builder Group**" has the meaning defined in Section 25.3.

"**Builder Personnel**" means all employees of Builder and the employees of any Subcontractor of Builder, at any tier.

"**Builder's Corporate Parent Guarantee**" means a corporate parent guarantee to be provided by Builder's corporate parent to Owner pursuant to Section 6.2, substantially in the form of Exhibit J, or as otherwise reasonably acceptable to Owner.

"**Builder's Representative**" means those Persons designated in writing by Builder to act as Builder's representative and act on behalf of Builder as its primary point of contact in connection with this Agreement and the Work.

"**Builder's Warranty Procedures**" has the meaning defined in Section 14.4, and are attached as Exhibit M.

"**Certificate of Completion and Delivery**" has the meaning defined in Section 4.8.

"**Certificate of Inspection**" means a certification of United States vessel inspection issued by the Coast Guard by either a Coast Guard Form CG-841 Certificate of Inspection or a Coast Guard Form CG-854, Temporary Certificate of Inspection.

"**Change Order**" means a written instrument prepared by Builder and signed by Owner and Builder, stating their agreement upon: (1) a change in the Work; (2) the amount of the adjustment in the Contract Price for the Vessel, if any; and (3) the extent of the adjustment in the Delivery Date, if any.

"**Classification Society**" means the American Bureau of Shipping, commonly referred to as "ABS."

"**Coast Guard**" or "**USCG**" means the United States Coast Guard.

"**Confidentiality Agreement**" means the Confidentiality Agreement between the Parties dated as of February 24, 2021.

"**Contract Documents**" has the meaning defined in Section 2.4.

"**Contract Drawings**" means the contract drawings listed in an addendum to the Specifications showing the design and construction of the Vessel as further described in the Specifications.

"**Contract Price**" means the price for the Vessel to be constructed and all related Work pursuant to this Agreement as shown in Section 3.1, including any Modifications thereto and any price adjustments allowed by this Agreement.

"**Days**" means Gregorian Calendar days, unless otherwise defined.  Each Day shall be a single twenty-four hour period commencing at 12:00 a.m., local time at the Shipyard at Philadelphia,

Pennsylvania.

"**Delivery**" means Builder's transfer of possession and Owner's acceptance of the Vessel completed in accordance with the Contract Documents, subject to the warranties set forth in Article 14, as evidenced by Builder's and Owner's execution of a Protocol of Delivery and Acceptance in the form of Exhibit I.

"**Delivery Documents**" has the meaning defined in Section 13.13(g).

"**Delivery Date**" means the date on which Builder is required to deliver the Vessel to Owner as shown in Section 1.8, subject to extensions through Permissible Delays pursuant to Article 16.

"**Delivery Payment**" means the final payment to be made by Owner to Builder in connection with the construction of the Vessel.

"**Delivery Point**" means the location at which the Delivery of the Vessel is to be made in accordance with Section 13.16, which shall be Builder's Shipyard located in Philadelphia, PA, or such other location as may be mutually agreed.

"**Designer**" means Ulstein Design & Solutions BV.

"**Detailed Design**" has the meaning defined in Section 7.4.

"**Dock Trials**" means the testing of any portion of the Work by Builder or Owner prior to, and as a condition of, Delivery as described in Section 13.1(a) and in the Specifications.

"**Effective Date**" shall be the date on which the later of the following events have occurred: (i) this Agreement has been signed by both Parties, and (ii) Owner has made payment of the initial Interim Installment Payment to Builder.

"**EPA**" means the United States Environmental Protection Agency.

"**Factory Acceptance Test**" means those tests conducted to determine that equipment or other Materials comply with the applicable specifications and contractual requirements prior to shipment to the Shipyard.

"**Final Rule**" means a rulemaking by a United States regulatory agency that has been promulgated by such agency as a final rule binding upon the regulated community.

"**First Refusal Right**" has the meaning defined in Section 1.9(a).

"**FRR Builder Notice**" has the meaning defined in Section 1.9(a).

"**FRR Owner Notice**" has the meaning defined in Section 1.9(b).

"**FRR Period**" has the meaning defined in Section 1.9(a).

"**Force Majeure**" has the meaning defined in Section 16.2.

"**Grace Period**" has the meaning defined in Section 17.2.

"**Good Shipbuilding Practice**" as used herein, means the construction of a vessel in accordance with all applicable flag state regulations and Classification Society Rules using those vessel construction practices and work management systems employed by competent and well-qualified commercial vessel builders, with due consideration to good quality, incorporating the specified components to meet Specification requirements, utilizing construction and testing methods to ensure that the completed Vessel will conform to the Contract Documents.

"**Guarantor**" has the meaning defined in Section 6.3.

"**IMO**" means the International Maritime Organization.

"**Initial Vessel**" has the meaning defined in Section 1.9(c).

"**Intellectual Property**" means all trade names, trademarks, service marks, and other identifying names or source indicia associated with the Work, whether registered or unregistered, and including all goodwill relating to any of the foregoing, and all applications for any of the foregoing; all patents, copyrights, including any design copyrights protected pursuant to 17 U.S.C. § 1301, et seq., copyright registrations and patent applications for the foregoing, together with all divisions, renewals, and continuations of any of the foregoing, and all know-how, unpatented inventions, trade secrets, and other intellectual property embodied in or pertaining to the Work or the Basic Design.

"**Interim Installment Payment**" means a payment due upon completion of a Stage of Completion in accordance with Section 4.1(a) and Exhibit O.

"**IP Claims**" has the meaning defined in Section 22.1.

"**Joint Surveyor**" has the meaning defined in Section 26.3.

"**Labor Agreements**" has the meaning defined in Section 16.6.

"**Letter of Credit**" has the meaning defined in Section 6.2(a).

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance

Schedule X - 4

of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust, or other preferential arrangement having the practical effect of any of the foregoing.

"**Lien Release**" means a lien release in favor of the Vessel and Owner, executed by Builder, in the form of Exhibit D.

"**Liquidated Damages**" means those amounts by which the Contract Price is to be reduced pursuant to Article 17 due to the late delivery of the Vessel

 "**Major Equipment**" means all items with a purchase cost of FIVE HUNDRED THOUSAND U.S. DOLLARS ($500,000) or greater, and also includes without regard to cost all engines, gearboxes, and the hydraulic system as referenced in the Specifications.

"**Makers List**" has the meaning defined in Section 9.17(a).

"**Materials**" means everything, other than OFE, that is required for the construction and Delivery of the Vessel in compliance with the Specifications, including, without limitation, all materials, supplies, machinery, machinery parts, equipment, electronics, hardware, piping, coatings, primers, paints, timber, ferrous and non-ferrous plate, shapes, and other tangible items that are incorporated or used in, or that are identified to or intended to be incorporated or used in, the construction of the Vessel.

"**Material Non-Conformities**" has the meaning defined in Section 13.11.

"**Material Subcontract**" means any contract of Builder with a Subcontractor, Supplier, or other vendor in connection with the Work with a value in excess of FIVE HUNDRED THOUSAND U.S. DOLLARS ($500,000).

"**Material Subcontractor or Supplier**" means Subcontractor or Supplier of Builder providing goods and/or services in excess of FIVE HUNDRED THOUSAND U.S. DOLLARS ($500,000) in respect of the Work.

"**Minor Non-Conformities**" has the meaning defined in Section 13.9.

"**Mission System**" has the meaning defined in Section 13.2.

"**Modification**" means: (1) a written amendment to this Agreement signed by both Parties, or (2) a Change Order.

"**Monthly Status Report**" has the meaning defined in Section 8.11.

"**New Tariffs and Duties**" has the meaning defined in Section 5.5.

"**NSMV-5**" has the meaning defined in Section 1.9(a).

"**NSMV Contracts**"  has the meaning defined in Section 16.15.

"**Notice of Arbitration**" has the meaning defined in Section 27.6.

"**Owner**" has the meaning defined in the Preamble.

"**OFE**" means owner-furnished equipment, which means those items and Materials furnished by Owner to be installed in the Vessel by Builder as part of the Work as identified in Exhibit B.

"**Owner Group**" has the meaning defined in Section 25.1.

"**Owner Personnel**" means all employees of Owner, Owner's Representative, and the employees of any subcontractor of Owner (excluding Builder Personnel), at any tier.

"**Owner's Representative**" means those Persons designated in writing by Owner to represent and act on behalf of Owner as described more fully in Section 11.1. as Owner's primary point of contact in connection with this Agreement and the Work.

"**Parties**" refers to Owner and Builder collectively, and "**Party**" means either of them individually.

"**Permissible Delay**" has the meaning defined in Section 16.1.

"**Person**" means an individual, or any corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or agency or political subdivision thereof (including any subdivision or ongoing business of any such entity).

"**Prime Rate**" has the meaning defined in Section 4.12.

"**Production Design**" has the meaning defined in Section 7.6.

"**Project Schedule**" has the meaning defined in Section 8.1 and more fully described in Article 8.

"**Protocol of Delivery and Acceptance**" means a document in the form of Exhibit I to be executed by Builder and Owner upon Delivery of the Vessel.

"**Purchase Technical Specifications**" has the meaning defined in Section 9.19.

"**Regulatory Authorities**" as used herein means the Coast Guard, the Classification Society, the U.S. Public Health Service, the International Maritime Organization, United States Customs and Border Protection, the EPA, and any other applicable governmental body or agency responsible for ensuring the Vessel's compliance with all requirements imposed by United States law and regulations, international conventions, and the Classification Society, or any other legal or regulatory requirement applicable to the Vessel (each a "**Regulatory Authority**").

"**Remedial Action Plan**" has the meaning defined in Section 18.2(c).

"**Retained Amount**" has the meaning defined in Section 13.2.

"**ROFR Vessel**" has the meaning defined in Section 1.9.

"**ROFR Vessel Price**" has the meaning defined in Section 3.2.

"**Sea Trials**" means those trials as described in Section 13.1(c) and in the Specifications.

"**Shipyard**" means collectively those shipyards and ancillary facilities owned, leased, or used by Builder in connection with the Work under this Agreement.

"**Shipyard Contract Deficiency Report**" means a report in the form set out in Exhibit K.

"**SMA Rules**" has the meaning defined in Section 27.4.

"**Specifications**" means the specifications attached hereto as Exhibit A.

"**Stage Completion Certificate**" means a certificate, in the form set forth in Exhibit C-1, attesting to the completion of each stage of the Work as referred to in Section 4.2 and corresponding to the Interim Installment Schedule set forth in Exhibit K.

"**Structural Steel**" has the meaning defined in Section 3.4(b).

"**Subcontractor**" means any Person other than an employee of Builder, engaged by Builder to execute any part of the Work under this Agreement on behalf of Builder.

"**Supplier**" means any Person responsible for the supply, manufacture, construction, installation, or delivery to Builder of any of the Materials.

"**System Tests**" has the meaning defined in Section 13.2.

"**Technical Disputes**" has the meaning defined in Section 26.3.

"**TOTE**" has the meaning defined in Section 3.4(g).

"**Trials**" means the testing of any portion of the Work by Builder or Owner prior to, and as a condition of, Delivery as described in Section 13.1 and in the Specifications.

"**Vessel**" means the vessel to be designed and constructed in accordance with the Contract Documents.

"**Warranty Period**" as used herein means the three hundred and sixty-five (365) Day period following Delivery of the Vessel, or in the case of a warranty given by a third party, such period specified in such warranty, but not less than the three hundred and sixty-five (365) Day period following Delivery of the Vessel.

"**Work**" as used herein, means the work required to be performed by Builder in accordance with the Contract Documents, whether performed by Builder or any Subcontractor and whether completed or partially completed, and includes all labor, Materials, equipment and services provided or to be provided by or on behalf of Builder to fulfill Builder's obligations hereunder. The Work shall also include Builder's obligation to pay in due course for all such labor, Materials, equipment, and services provided or to be provided on behalf of Builder to fulfill Builder's obligations hereunder.

"**Working Days**" means "business days," Monday through Friday, excluding weekends and national or state recognized holidays applicable to the local jurisdiction in which the Work is performed.