**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GREAT LAKES DREDGE & DOCK COMPANY, LLC,** **Plaintiff** | |
| **v.** | **Case No. 24-cv-6198** |
| **PHILLY SHIPYARD, INC.,** **Defendant** | |

<u>**MEMORANDUM OPINION**</u>

**Costello, J.**                                                    **December 13, 2024**

## I.    INTRODUCTION

Plaintiff Great Lakes Dredge & Dock Company, LLC ("Great Lakes") contracted with Defendant Philly Shipyard, Inc. ("PSI") to build a subsea rock installation vessel ("SRIV"). PSI has made substantial progress on the construction of the SRIV. At the same time, PSI has been building other vessels. Presently, the partially completed SRIV is sitting in a dry dock in front of another vessel that is further along in construction. PSI recently proposed a maneuver known as a tandem float to move the other vessel from behind the SRIV so PSI can timely complete and deliver the other vessel. Great Lakes opposes the tandem float and now seeks a temporary restraining order and preliminary injunction to prevent it.[1]

---

[1]  Great Lakes also seeks preliminary injunctive relief unrelated to the tandem float proposal, namely, to enjoin and require certain specific actions to speed up construction of the SRIV. During a telephone conference, the parties agreed that the tandem float proposal was the most urgent issue. In addition, PSI suggested that the other injunctive relief was barred by an arbitration provision in the parties' contract. PSI subsequently filed a Motion to Compel Arbitration and Stay Proceedings. Great Lakes has not yet had an opportunity to respond. At the parties' joint request, the Court will delay consideration of the other injunctive relief sought by Great Lakes until after the Court rules on SCI's Motion to Compel Arbitration. The parties agree

Great Lakes argues that the proposed tandem float maneuver would breach the contract between the parties because the process of preparing for and carrying out the maneuver materially changes the build strategy for the SRIV and puts it at risk of sustaining serious damage. In addition, Great Lakes argues that the planned maneuver signals that PSI is planning to divert resources away from the construction of the SRIV in favor of other vessels under construction, in violation of PSI's contractual duty of diligence. Great Lakes alleges that it will be irreparably harmed if the tandem float proceeds and the SRIV is damaged, or its completion is otherwise delayed.

PSI counters that it needs to perform the tandem float to appropriately manage construction activity at the shipyard and that the proposed maneuver would not alter the build strategy of the SRIV. PSI also disputes that the SRIV will be put at risk of serious damage or that the tandem float forecasts a lack of diligence on its part. On the contrary, PSI alleges that the tandem float will allow PSI to complete the SRIV sooner than currently forecasted. Moreover, PSI argues that its business will be harmed if it is not able to proceed with the tandem float and efficiently manage the shipyard. Among other things, PSI would be unable to fulfill other contracts, including the construction of national security vessels that support the merchant marines and natural disaster relief efforts.

The Court held an evidentiary hearing regarding the tandem float proposal. After considering the parties' submissions and the evidence presented, the Court denies Great Lakes' motion for preliminary injunctive relief with respect to the tandem float proposal. As is more fully discussed below, Great Lakes has not established any of the factors required for issuance of

---

that the arbitration provision does not preclude Great Lakes from seeking preliminary injunctive relief with respect to the tandem float proposal. Accordingly, this memorandum addresses only that aspect of the requested relief.

a temporary restraining order or preliminary injunction.  In essence, the tandem float proposal is

a matter of larger shipyard operations.  Great Lakes has not shown how PSI's management of its

shipyard would cause either a breach of the parties' contract or irreparable harm.  Moreover, the

evidence suggests that PSI will suffer drastic harm if it is not able to manage the current

placement of the vessels.

## II.    FACTS

### A.    The Parties

Great Lakes is a provider of dredging services.  Declaration of Christopher G. Gunsten,

P.E. ("Gunsten Decl.")  ¶ 4.[2]  Recently, Great Lakes decided to venture into the United States

offshore wind market by investing in the build of the SRIV, which it hopes will be the first

United States-flagged, Jones Act-compliant subsea rock installation vessel for wind turbine

foundations.  *Id.* ¶¶ 5, 6.  The vessel is designed to place rocks on the seabed to protect

infrastructure, such as pipelines, cables, or offshore windmills.  Transcript of Motion Hearing

("Tr.") at 29 (Testimony of Christopher Gunsten), 107 (Testimony of Raymond E. Staton, Jr.).

PSI is a large-scale shipbuilding company located within the Navy yard in Philadelphia.

Declaration of Thomas Grunwald ("Grunwald Decl.") ¶ 4.[3]  PSI builds very large, complex

commercial and government vessels, including container ships and National Security Multi-

Mission Vessels ("NSMVs").  *Id.* ¶ 9.  Typically, it takes PSI three to five years to complete such

vessels.  *Id.* ¶ 7.

---

[2]  The Gunsten Declaration (ECF No. 7-4) is Attachment A to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiff's Motion") (ECF No. 7).

[3]  The Grunwald Declaration (ECF No. 22-1) is an attachment to Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Defendant's Opposition") (ECF No. 22).

### B.     The Contract

After a bidding process, Great Lakes hired PSI to build the SRIV.  Gunsten Decl. ¶ 14.

Time was of the essence for Great Lakes, and it selected PSI, in part, based on its understanding

that PSI would complete and deliver the SRIV on a timeline acceptable to Great Lakes.  *Id.* ¶¶ 7,

10, 14.  On November 15, 2021, Great Lakes and SCI entered into a Vessel Construction

Agreement ("VCA") for the build of the SRIV.[4]  *Id.* ¶ 15.  In exchange for the build of the SRIV,

Great Lakes agreed to pay $197,072,245 to PSI.  Grunwald Decl. ¶ 38.

Of importance here, the VCA requires PSI to establish and maintain a detailed project

schedule and execution plan to be shared with Great Lakes on an ongoing basis.  VCA Article 8.

In addition, the VCA provide as follows:

> <u>Modifications to Build Strategy</u>.  Following the availability of the initial Project
> Schedule as provided in Section 8.4, [PSI] may, in the exercise of Good
> Shipbuilding Practice, propose a modification to the build strategy of the [SRIV]
> that alters the predicates to milestone payments from those set forth in the [VCA],
> but such modification shall be permitted only upon prior written approval by
> [Great Lakes], such approval not to be unreasonably withheld, conditioned or
> delayed.

VCA § 8.7.  "Build strategy" is not defined in the VCA.  According to the VCA, any word not

specifically defined "shall be construed and interpreted according to its ordinary meaning and

shall be used so as to fairly accomplish the purposes and intentions of the Parties."  *Id.* § 2.2.

According to PSI's Project Manager, the concept of "build strategy" generally refers to "how the

units will be constructed, the phase in which the outfitting will be installed, and how they will be

dock mounted to complete the vessel."  Tr. at 126 (Staton Testimony).  In other words, it refers to

the sequence of construction.  *Id.* at 148.  The phrase "predicates to milestone payments" also is

---

[4]  A complete copy of the VCA (ECF No. 22-3) is attached as Exhibit B to Defendant's
Opposition.

not defined in the VCA.  Tr. at 90 (Gunsten Testimony).  However, the VCA includes specific

definitions explaining the work that would need to be completed for achievement of each

milestone and these definitions are set in a particular order.  *Id.* at 89-90; VCA Table O-2.

Article 8 of the VCA includes certain remedies for failure to comply with the contract

terms in Article 8.  Failure to provide access to the project schedule or to keep the schedule up to

date gives Great Lakes discretion to terminate the VCA.  VCA § 8.9.  Similarly, failure to make

adequate progress on the SRIV, defined as delivery of the SRIV more than 105 days later than

the agreed upon delivery date, would give Great Lakes the right to terminate the VCA subject to

PSI's right to cure.  VCA § 8.14.

Of additional importance here, the VCA addresses PSI's duty of diligence.  VCA

§ 9.4.  Among other things, PSI must prosecute the work diligently to ensure completion of the

SRIV in accordance with the VCA.  VCA § 9.4(a).  In addition, PSI agreed to furnish, among

other things, all necessary and available resources as reasonably practicable to complete the work

timely.  VCA § 9.4(b).  Subsections (c) and (d) provide as follows:

> (c) *Builder to Prioritize Completion*. Builder expressly agrees it will not take, or
> fail to take, any action based on an assumption that the payment of liquidated
> damages would be more economically advantageous for Builder than the cost
> of allocating necessary available resources to the construction of the Vessel
> that, if so allocated would prevent or lessen any delay in the delivery of the
> Vessel.
>
> (d) *Owner's Right to Equitable Relief*. Builder acknowledges and agrees that a
> breach by Builder of its obligations under this Section 9.4 would present
> irreparable harm to Owner and Owner shall have the right to seek equitable
> relief, including an injunction, to prevent or rectify any such breach by Builder.

As indicated in Section 9.4(c), the VCA includes a liquidated damages provision.

Specifically, Article 17 provides for the payment of liquidated damages in the event of delay,

described as delivery of the SRIV after the contractual delivery date.  Section 17.8 provides in

relevant part that "in the event of late Delivery of the Vessel, [Great Lakes] shall suffer damages that are difficult to ascertain, and the Parties acknowledge and agree that liquidated damages in the amounts" set forth in Article 17 "are a reasonable estimate of the anticipated damages" that Great Lakes may suffer because of delayed delivery.  Notwithstanding the liquidated damages provision, Great Lakes reserved its equitable remedies as contemplated by Section 9.4(d) and Section 27.12, which preserves the parties' rights to seek equitable and provisional relief.  VCA § 17.8.

In addition to liquidated damages, Great Lakes has the right to terminate the VCA for late delivery.  VCA § 17.9(a).  Article 18 of the VCA addresses in detail the respective rights and obligations of each party in the event of default or termination.

The VCA also includes an exclusive remedies provision, which provides that:

> The Parties confirm that the express remedies and measures of damages provided in the [VCA] satisfy the essential purposes hereof.  For breach of any provision for which an express remedy or measure of damages is provided, such express remedy or measure of damages shall be the sole and exclusive remedy or measure of damages therefor.  If no remedy or measure of damages is expressly herein provided, the obligor's liability shall be limited to direct actual damages only; and such direct actual damages shall be the sole and exclusive remedy.

VCA § 19.4.

### C.    The Tandem Float Proposal

When operating at full capacity, PSI is working on four vessels at one time.  Grunwald Decl. ¶ 6.  These vessels are usually in various stages of construction.  *Id.*  PSI has two large dry docks, Dock 4 and Dock 5.  *Id.* ¶ 5.  One is used primarily for constructing new vessel hulls, while the other is used primarily for outfitting and commissioning new vessels.  *Id.*  For

logical reasons, ships and components sometimes need to be moved around the shipyard. Declaration of Raymond Staton, Jr. ("Staton Decl.") ¶ 8.[5]

While working on the SRIV, PSI was also working on what the parties refer to as NSMVs. The NSMVs are vessels purchased by the United States Department of Transportation, Maritime Administration ("MARAD"). Grunwald Decl. ¶ 23. The NSMVs are used as training vessels by the maritime academies and to support disaster response. *Id.* Among other things, the NSMVs are designed with hospital facilities, a helicopter landing pad, and room for 1,000 people. *Id.* PSI has completed and delivered two NSMVs and is working on three others (NSMV 3, NSMV 4, and NSMV 5), which are in various stages of construction. *Id.* at ¶ 24.

The SRIV, which is approximately 65% complete (*Id.* ¶ 17), is currently situated in PSI's Dock 4 in front of NSMV 4. Tr. at 38 (Gunsten Testimony). NSMV 4, however, is ready to be moved to Dock 5 for outfitting so that it can be completed and delivered to MARAD. Staton Decl. ¶¶ 11, 18. Accordingly, in September 2024, PSI proposed to conduct a tandem float of the SRIV to move NSMV 4 out of Dock 4 and into the outfitting dock. *Id.*; Tr. at 125 (Staton Testimony).

The process would involve towing the partially constructed SRIV into a controlled section of the Delaware River near the shipyard where it would float for approximately 15-30 minutes before being re-docked into a flooded Dock 5. Staton Decl. ¶ 13. The SRIV would then be returned to Dock 4 once the NSMV 4 has been removed. *Id.* The NSMV 5, which is at an earlier production stage, would be constructed behind the SRIV in Dock 4. *Id.* The entire

---

[5] The Staton Declaration (ECF No. 22-5) is an attachment to Defendant's Opposition (ECF No. 22).

process would take approximately two to three days and the SRIV would be in the river for a total time of less than one hour.  *Id.* ¶ 14.

To execute the tandem float, PSI will need to make certain temporary modifications to the SRIV, including welding on temporary closure plates to keep the SRIV from taking on water and installing pad eyes or lashing points for tugboats to secure their lines during the towing portion of the maneuver.  Tr. 117 (Staton Testimony).  None of the necessary modifications are irreversible.  *Id.* at 119.  PSI plans to continue work on the SRIV during the tandem float.  *Id.* at 118.  However, the tandem float will cause some lost time for completion of the SRIV.  *Id.* at 147.  Nonetheless, in addition to being able to complete and deliver the NSMV 4, PSI expects the tandem float to ultimately allow for accelerated completion of the SRIV.  *Id.*

When approached with the proposal, Great Lakes did not share PSI's optimism.  Great Lakes had immediate concerns about the modifications to the SRIV, the risks inherent in the tandem float, and the possibility that PSI was deprioritizing the SRIV in favor of other vessels.  Gunsten Decl. ¶¶ 33-46.  Accordingly, Great Lakes objected to the tandem float and sought injunctive relief to prevent it.  *Id.* ¶ 31.

### D.    The Hearing

At the hearing regarding the tandem float, Great Lakes offered argument and evidence, including testimony, suggesting that the modifications for, and execution of, the tandem float proposal would violate the VCA.  Tr. at 30 (Gunsten Testimony).  More specifically, the Senior Vice President for Project Services and Fleet Engineering for Great Lakes testified that the proposed modifications would constitute unauthorized changes to the build strategy in violation of VCA § 8.7.  *Id.* at 31-32, 34-35, 46, 79-83.  The witness testified that PSI changed the order of certain predicates to milestone payments to accommodate the tandem float.  *Id.* at 79-83.  Such

an alteration to the predicates to milestone payments would require Great Lakes' consent, which PSI has never sought. *Id.* In addition, the witness testified that the tandem float proposal suggests that PSI plans to prioritize other customers, including MARAD, to the detriment of Great Lakes and in violation of PSI's duty of diligence. *Id.* at 40. In support, Great Lakes pointed to production schedules provided by PSI that purportedly forecast a reduction in manhours committed to the SRIV following the tandem float. *Id.* at 55-60, 62, 69-74.

PSI countered with argument and evidence, including testimony, that the tandem float would not change the build strategy or violate PSI's duty of diligence. PSI's Project Manager testified that the tandem float would not alter the build strategy or the milestone payments for the SRIV. Tr. at 127 (Staton Testimony). Specifically, the Project Manager testified that the sequence of construction would not change. *Tr.* at 148 (Staton Testimony). In addition, the witness testified that preparations for the tandem float would not damage or permanently alter the SRIV. *Id.* at 119, 121-123. In fact, according to PSI's Project Manager, temporarily installing and removing steel and lashing points is a typical part of shipbuilding. *Id.* Indeed, PSI often adds temporary structure and lashing points to block units so it can move them around the shipyard in the ordinary course of construction. *Id.* In addition, the Project Manager testified that the change in the order of milestone payments noted by Great Lakes was a "simple error" on PSI's part that was unrelated to the tandem float proposal. *Id.* at 127-128, 163-164. The witness clarified that PSI was not seeking to change the order of milestone payments. *Id.* at 128.

Moreover, PSI's Project Manager testified that the process for preparing the SRIV for the tandem float would not negatively impact the timeline for the build strategy. *Id.* at 129. While preparing for the tandem float, PSI would continue the build by installing outfitting materials to certain SRIV grand blocks. *Id.* Thus, rather than deprioritizing the SRIV, the tandem float

would allow PSI to outfit the hull on an accelerated basis. *Id.* Without the tandem float, the delivery date for the SRIV will increase by approximately six months. *Id.* at 129, 149.

With respect to Great Lakes' allegation that PSI intended to reduce manpower after the tandem float, the Project Manager explained that Great Lakes based its argument on a theoretical schedule that was contingent on Great Lakes contributing acceleration costs for material delivery, which never happened. *Id.* at 130-131, 133, 136. Thus, the theoretical schedule forecasted increased manhours based on acceleration support that never materialized. *Id.* The schedule with fewer manhours, therefore, did not forecast an actual reduction in manhours at all and, in any event, did not relate to the tandem float proposal. *Id.* Further, PSI's Project Manager testified that PSI had no incentive to deprioritize the SRIV. *Id.* at 137. The longer the SRIV sits in the shipyard, the higher its costs. *Id.* Pursuant to the VCA, PSI is liable for increased construction costs. *Id.* Therefore, slowing down construction of the SRIV would be detrimental to PSI. *Id.*

With respect to irreparable harm, Great Lakes expressed a lack of confidence in PSI's risk assessment and competence to execute the tandem float safely. *Id.* at 42-45. Great Lakes contended that if carried out, the tandem float could result in substantial damage to the SRIV, including total loss. *Id.* at 42-49, 77. In the event of total loss, Great Lakes insisted that it could not be adequately compensated by money damages because its reputation in an emerging market and with investors would be severely damaged. *Id.* at 47, 77-78.

PSI countered with evidence regarding the execution of tandem floats at other shipyards and the measures PSI has taken to plan and prepare for the maneuver and to mitigate risk. *Id.* at 109-126. PSI's Project Manager testified that tandem floats are common in Korea, where shipbuilders have carried out more than 2,500 tandem floats in the last 30 years. *Id.* at 109, 124.

In addition, shipbuilders in the United States have also carried out tandem floats. *Id.* While PSI has never executed a tandem float, PSI's Project Manager testified that he participated in a tandem float for a U.S. Navy ship in Tampa, Florida. *Id.* at 109, 124, 139.

The Project Manager further testified that PSI made stability and structural calculations of the SRIV in anticipation of the tandem float and would continue doing so to have the most current information. *Id.* at 113-114. In addition, the Project Manager testified to PSI's other preparations for the tandem float, including measures intended to make the partially completed SRIV waterproof, as discussed above (*Id.* at 116- 126), and to ensure the safety and integrity of the SRIV as the dock is flooded, such as stationing personnel on board the SRIV, and divers below. *Id.* at 115. Based on its preparations, PSI's Project Manager testified that he was not at all concerned that the SRIV would be damaged during the tandem float. *Id.* at 124. Indeed, PSI discussed its plans for the tandem float with its builder's risk insurer, which reportedly expressed no concerns about the proposal. *Id.* at 125. Based on the foregoing, PSI contended that there was no danger of irreparable harm and that, if anything, the tandem float would benefit Great Lakes while allowing PSI to make efficient use of its shipyard.

In addition, PSI presented evidence of the harm that would result if it could not proceed with the tandem float. *Id.* at 177-179 (Grunwald Testimony). Specifically, PSI's Vice President testified that if PSI is not able to move the NSMV 4 from behind the SRIV, then it will not be able to meet its contractual obligations to the government. *Id.* at 177-179. In addition, if NSMV 4 blocks the dry dock, then PSI cannot proceed with the build of NSMV 5 or other vessels, and PSI would experience a very high production backlog. *Id.* Because of the resulting loss of income and reduction in cashflow, PSI would have to lay off hundreds of workers. *Id.* at 177-

178.  In short, PSI would experience drastic consequences if it cannot temporarily move the SRIV out of Dock 4 to release the NSMV 4.  *Id.*

## III.    DISCUSSION

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a).  Preliminary injunctions are reserved for "extraordinary situations."  *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dept. of Safety & Homeland Sec.*, 108 F.4th 194, 198 (3d Cir. 2024).  Preliminary injunctions, by their nature, present numerous policy concerns, including the expedited nature of the proceedings, the granting of a remedy based on a prediction of what the law requires, and the risk of prejudging the merits of a case.  *Id.* at 200.  Preliminary injunctions are not intended to prevent all harm.  Instead, a preliminary injunction should be granted only to prevent harm that threatens to "moot a case" such "as when one party's conduct could destroy the property under dispute, kill the other party, or drive it into bankruptcy, 'for otherwise a favorable final judgment might well be useless.'"  *Id.* at 201 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)).

To obtain the extraordinary remedy of a preliminary injunction, the moving party must make a "clear showing" of entitlement to relief.[6]  *Id.* at 202 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 672 (1997) (per curiam)); s*ee also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000).  Specifically, the moving party must show that the following factors weigh in favor of issuing the injunction: 1) a likelihood of success on the merits; 2) irreparable harm if the requested relief is denied; 3) that the relief granted would not result in greater harm to the

---

[6]  The same standard applies to temporary restraining orders and preliminary injunctions.  *See, e.g., Zaslow v. Coleman*, 103 F. Supp. 3d 657, 662 (E.D. Pa. 2015) (citing *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994)).

nonmoving party (also known as the balance of equities); and 4) that the public interest favors relief. *Delaware Sportsmen's Ass'n, Inc.*, 108 F.4th at 202.

"The first two factors are the 'most critical.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). These factors are known as "gateway factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If the moving party fails to establish the likelihood of success on the merits and irreparable harm, it is not entitled to an injunction. *Id.* The gateway factors have a correlative relationship. If the harm an injunction can prevent is great, a plaintiff has a lighter burden for demonstrating reasonable likelihood of success on the merits. *Reilly*, 858 F.3d at 179 (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)); s*ee also Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 684 (E.D. Pa. 2022) (collecting Third Circuit authority). Plaintiff Great Lakes has failed to establish either of the gateway factors.

## A.    Likelihood of Success

To establish a likelihood of success on the merits, Great Lakes must establish that it has a reasonable chance of winning. *Trs. Of Gen. Ass. of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F. Supp. 3d 722, 768 (E.D. Pa. 2021) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)). Success requires a "showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179. Put another way, Great Lakes must "'demonstrate that it *can* win on the merits,'" *Mallet and Co., Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quoting *Reilly*, 858 F.3d at 179 & n.3) (emphasis in original).

Great Lakes has failed to meet its burden. The proposed tandem float would involve a shuffling of vessels to allow PSI to make efficient and productive use of its limited dock space.

13

Simply because this contingency is not addressed in the VCA does not make it a breach of that agreement.  Great Lakes must show something more.

To properly plead breach of contract under New York law,[7] a plaintiff must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.  *See 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022).  To prove breach, Great Lakes must establish that PSI acted in violation of the VCA's terms.  *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996).  Here, Great Lakes has argued that the tandem float would breach the build strategy provision of the VCA as well as PSI's contractual duty of diligence.  However, the evidence presented does not support Great Lakes' argument.

### 1.    Modification of the Build Strategy

To establish a breach of Section 8.7 of the VCA, Great Lakes would have to show that the tandem float involves a modification to the build strategy of the SRIV that alters the predicates to milestone payments set forth in the VCA, and that its approval of such modification was not unreasonably withheld, conditioned, or delayed.  VCA § 8.7.

Great Lakes has not shown any of these things.  As an initial matter, Great Lakes has not shown that the tandem float, which involves changing the position of certain vessels in PSI's docks, represents a modification of the build strategy of the SRIV.  If the tandem float proceeds, PSI would continue building the SRIV as previously contemplated.  The sequence of

---

[7] The VCA is governed by New York law.  VCA § 30.11.  To determine whether this provision is enforceable, federal courts sitting in diversity "must apply the choice of law rules of the forum state."  *Bookard v. Estee Lauder Cos., Inc.*, 443 F. Supp. 3d 561, 569 (E.D. Pa. 2020) (quoting *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)).  "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."  *Id.* (quoting *Kruzits*, 40 F.3d at 55).  Accordingly, the Court will apply New York law to the breach of contract claim.

construction would not change. Indeed, PSI intends to perform outfitting work on the SRIV as it prepares for and carries out the tandem float. With respect to the modifications that PSI must make to waterproof the SRIV in preparation for the float, the evidence suggests that these temporary measures (for example, installing and removing steel and lashing points) would not damage the SRIV and are consistent with typical shipbuilding practices, such as when PSI must move large vessel components around the shipyard in the ordinary course of construction. Accordingly, these temporary modifications have no impact on, and are not modifications to, the overall build strategy.

Even if the tandem float could be construed as modifying the build strategy, Great Lakes must also show that such modification alters the predicates to milestone payments. Great Lakes presented evidence that PSI changed, or flipped, the order of two milestone payments after it proposed the tandem float. However, PSI presented sufficient evidence, at least at this early stage of the proceedings, to rebut that argument. Specifically, PSI presented testimony that it had no intention of altering the order of the milestone payments and that the so-called flipping of the milestone definitions was an error that was unrelated to the tandem float.

Finally, even if the tandem float could be construed as a modification of the build strategy that alters the predicates to milestone payments, Great Lakes is contractually obligated to not unreasonably withhold, condition, or delay its approval of the proposed modification. VCA § 8.7. Great Lakes may have acted unreasonably here. The obligation of Great Lakes to act reasonably in withholding consent is governed by the covenant of good faith and fair dealing, which is implied in all contracts governed by New York law. *Dalton v. Educational Testing Service*, 663 N.E.2d 289, 291 (N.Y. 1995). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that

discretion". *Id.* at 291. Given the drastic consequences PSI would face if it cannot proceed with the tandem float, including an inability to meet its other contractual obligations, PSI could likely show that Great Lakes acted arbitrarily or irrationally by withholding consent.

In short, Great Lakes has not shown that it can succeed in proving a breach of Section 8.7 of the VCA.

### 2.    PSI's Duty of Diligence

Similarly, Great Lakes is not likely to succeed in establishing that the tandem float would result in a breach of PSI's duty of diligence under Section 9.4 of the VCA. Great Lakes has not shown how the tandem float itself would breach this provision. Instead, it perceives the tandem float proposal as a signal that PSI intends to deprioritize the construction of the SRIV in favor of other projects once the vessels are re-ordered in the docks. However, the evidence contradicts this perception. First, as stated above, PSI intends to continue work on the SRIV as it prepares for and carries out the tandem float. Second, the tandem float would allow PSI to outfit the hull of the SRIV on an accelerated basis. Without the tandem float, the delivery date for the SRIV will increase by approximately six months. Thus, the tandem float would allow PSI to accelerate, rather than reduce, its work on the SRIV. Finally, PSI does not benefit by delaying the build of the SRIV. The longer the SRIV sits in the shipyard, the higher the cost to PSI. The evidence simply does not support Great Lakes' claim that the tandem float is a precursor to a breach of PSI's duty of diligence. On the contrary, the evidence suggests that PSI intends to work diligently to ensure completion of the SRIV as required by Section 9.4 of the VCA.

Therefore, based on the evidence presented at this preliminary stage, Great Lakes has not shown that it is reasonably likely to succeed on the merits of its breach of contract claim with respect to the tandem float proposal.

### B.    Irreparable Harm

Great Lakes has also failed to show that it will be irreparably harmed if PSI proceeds with the tandem float.[8]  Great Lakes must show that it is "more likely than not" to suffer irreparable harm as the result of SCI's conduct.  *Reilly*, 858 F.3d at 179.  To establish irreparable harm, Great Lakes must demonstrate "a significant risk" that any harm it suffers as result of the tandem float "cannot adequately be compensated after the fact by monetary damages."  *Cigar Ass'n of Am.,* 500 F. Supp. 3d at 436 (quoting *Adams*, 204 F.3d at 484-85).  "Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it."  *Trs. of Gen. Ass. of Lord Jesus Christ of Apostolic Faith, Inc.*, 527 F. Supp. 3d at 774 (quoting *Kos. Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004)).

If the Court would be unable to "decide the case or give [Plaintiff]… meaningful relief" without a preliminary injunction, a party has shown irreparable harm.  *Delaware State Sportsmen's Ass'n, Inc.*, 108 F.4th at 205.  This harm must either be "immediate" "or a presently existing actual threat."  *LVL Co., LLC v. Atiyeh*, 469 F. Supp. 3d 390, 423 (E.D. Pa. 2020) (quoting *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).  "Establishing a risk of irreparable harm is not enough."  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).  Preliminary injunctions are "not [to] be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties."  *Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc.*, 864 F. Supp. 2d 316, 325 (E.D. Pa. 2012).

---

[8]  The question of irreparable harm is governed by federal law.  *See Cigar Ass'n of Am. v. City of Philadelphia*, 500 F. Supp. 3d 428, 435 (E.D. Pa. 2020) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989)); *see also Figueroa v. Precision Surgical, Inc.*, 423 F. App'x 205, 207 (3d Cir. 2011).

Preliminary injunctions are sometimes appropriate in contract cases. *ASI Business Solutions, Inc. v. Otuska Pharmaceutical, Inc.*, 233 F. Supp. 3d 432, 438 (E.D. Pa. 2017) (collecting cases where courts have granted preliminary injunctions based on breach of contract claims). In these cases, irreparable harm typically exists in two scenarios: (1) where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable. *ECRI*, 809 F.2d at 226.

Economic loss, including "temporary loss of income, ultimately to be recovered," does not usually constitute irreparable injury. *Golden Fortune Import & Export Corp. v. Mei-Xin Ltd.*, Nos. 22-1710 and 22-1885, 2022 WL 3536494, at *6 (3d Cir. Aug. 5, 2022) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). As the Supreme Court explained "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90 (further citation omitted).

Economic losses can serve as the basis for irreparable harm only when a business would be "forced to shut down" as the result of the loss. *Instant Air Freight Co.*, 882 F.2d at 802. Such a showing is an onerous one. For example, in *Instant Air Freight*, the Third Circuit held that the loss of eighty percent of plaintiff's business as a result of defendant's conduct was not enough of an economic loss to constitute irreparable harm. *Id.*

In addition, damage to property that is compensable at law is not irreparable harm. *McBean v. Guardian Ins. Agency*, 52 F. Supp. 2d 518, 521 (D.V.I. 1999) (deterioration of house

damaged by hurricane due to nonpayment of insurance benefits is not irreparable harm); *Weeks*
*Marine, Inc. v. BAE Systems Southeast Shipyards Alabama, LLC*, No. 14-905, 2014 WL
2533408, at *3 n.4 (E.D. La. June 4, 2014) (although not ruling on issuance of preliminary
injunction, court observed that deterioration of vessel condition at a shipyard during pendency of
arbitration proceedings was not irreparable harm); *Lambert v. Bd. of Comm'rs of Orleans Levee*
*Dist.*, No. 05-5931, 2006 WL 8456316, at *7 (E.D. La. Mar. 22, 2006) ("physical damage" or
possible "total loss" of vessel could not constitute irreparable harm even where such harm was
allegedly caused by constitutional violations); *Bouchard Transportation Co., Inc. v. Dep't of*
*Homeland Security*, No. 20-1116, 2020 WL 1689869, at *2 (E.D. La. April 7, 2020)
(deterioration of condition of vessel could not constitute irreparable harm); *but see Inst. of*
*Ceacean Rsch. v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 945-46 (9th Cir. 2013)
(finding irreparable harm based on damage to and potential total loss of whaling vessels while
traveling in Antarctic waters with crew on board based on intentional conduct of defendant
ramming and tossing projectiles at whaling vessels).

Other attempts to convert claims for monetary damages into those for nonmonetary
damages have similarly failed. "[A] plaintiff in a breach of contract case cannot convert
monetary harm into irreparable harm simply by claiming that the breach of contract has
prevented it from performing contracts with others and that this subsequent failure to perform
will harm the plaintiff's reputation." *Bennington Foods LLC v. St. Croix Renaissance Grp., LLC*,
528 F.3d 176, 178-79 (3d Cir. 2008). The party seeking the injunction must establish that its
business "is different from other types of commerce in such a way that normal breach of contract
remedies could not provide a remedy." *Id.* at 179. The reputational harm must be direct. *Id* at
180. It is not sufficient to allege that defendant's breach will deny plaintiff the resources needed

to meet its contractual obligations with its own customers. *Id.* Such a claim is indistinguishable from an ordinary breach of contract claim. *Id.*

Here, Great Lakes has argued that the tandem float is a risky procedure that could result in substantial damage to the SRIV, including total loss. In the event of substantial delay or total loss, Great Lakes insists that it could not be adequately compensated by money damages because its reputation in an emerging market and with investors would be severely damaged.

In support of its argument, Great Lakes points to Section 9.4(c) of the VCA, which provides in relevant part that a breach of SCI's duty of diligence under Section 9.4 "would present irreparable harm" to Great Lakes. However, parties "cannot contract to 'create a right to injunctive relief where it would otherwise be inappropriate.'" *Herley Indus., Inc. v. R Cubed Engineering, LLC*, No. 20-2888, 2020 WL 6504588, at *8 (E.D. Pa. Nov. 5, 2020). Certainly, Section 9.4(c) is probative of the presence of irreparable harm. *USA Tachs., Inc. v. Tirpak*, No. 12-2399, 2012 WL 1889157, at *6 (E.D. Pa. May 24, 2012). However, it is not conclusive. *Radian Guar. Inc. v. Bolen*, No. 13-6197, 2014 WL 2777450, at *9 (E.D. Pa. June 19, 2014) (collecting cases); *Cabela's LLC v. Highby*, 362 F. Supp. 3d 208, 224 (D. Del. 2019) (noting that "most federal courts do not consider a contractual stipulation dispositive for purposes of showing irreparable harm."). Therefore, Section 9.4(c) is only one factor to consider in determining irreparable harm.

However, any damage to the SRIV that Great Lakes argues may occur as a result of the tandem float does not constitute irreparable harm. Such damage is the very definition of a pecuniary loss that is compensable at law. *See, e.g., McBean*, 52 F. Supp. 2d at 521; *Lambert*, 2006 WL 8456316, at *7. It is also worth noting the inclusion in the VCA of various provisions providing for monetary damages, including liquidated damages, in the event of breach. See, for

20

example, VCA §§ 17.8 (liquidated damages), 19.4 (direct and actual damages the exclusive

remedy for breach).  These provisions suggest that Great Lakes has an adequate legal remedy for

a breach of the VCA.

More importantly, however, Great Lakes' fear of catastrophe should the tandem float

proceed and its speculation that consequential damages, such as loss of reputation, could follow,

are not evidence of irreparable harm.  Their claim for loss of reputation and business, *i.e.*, that

any delay caused by damage to or total loss of the SIRV as the result of the float plan would

render Great Lakes unable to meet its contractual obligations with its customers; is precisely the

type of harm that the Third Circuit has held is not irreparable.  *Bennington Foods LLC*, 528 F.3d

at 178-80.  Something more is required.  Preliminary injunctions are not issued simply to calm

the fears and anxieties of the parties.  *Grant Heilman Photography,* 864 F. Supp. at 325.  This is

not to say that Great Lakes' concerns about the risks posed by the tandem float are unreasonable.

It is merely to say that such concerns are not sufficient to justify the extraordinary remedy of the

preliminary injunctive relief requested here.

Instead, Great Lakes must show a possibility of harm that is immediate and presently

existing.  Even taking Section 9.4(c) into account, Great Lakes has not met its burden.  Great

Lakes has repeatedly brushed aside the assurances that PSI has provided in mitigation of the

inherent risks of executing a marine operation of this sort.  For example, PSI presented evidence

that numerous tandem floats have been executed previously without issue, including by PSI's

current Project Manager.  In addition, PSI presented evidence that it has conducted, and is

continually updating, stability and structural calculations for the tandem float.  Moreover, PSI

presented evidence of other preparations for the tandem float, including measures to make the

partially completed SRIV waterproof and to ensure the safety and integrity of the SRIV as the

dock is flooded.  Based on its preparations, PSI, which also has much to lose if the tandem float goes wrong, has expressed that it is not at all concerned that the SRIV would be damaged during the operation.  Great Lakes appears to consider these measures insufficient because some risk would still exist.  However, the mere risk of irreparable harm is simply not enough to justify the issuance of a preliminary injunction.

### C.    The Balance of the Equities

Even if Great Lakes could satisfy the gateway factors, the remaining factors weigh against the issuance of an injunction.  With regard to balancing the equities, the Court considers whether and to what extent PSI will suffer irreparable harm if the preliminary injunction is issued.  *See Kos Pharmaceuticals, Inc.*, 369 F.3d at 727.  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winters v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (further citation omitted).

Great Lakes contends that PSI will suffer no harm if it cannot proceed with the tandem float.  This is simply not true.  If PSI is not able to move the NSMV 4 from behind the SRIV, it will not be able to meet its contractual obligations to the government.  PSI will not be able to complete the NSMV 4, which is further along than the SRIV, and it will not be able to proceed with construction of the NSMV 5, which is not as far along as the SRIV.  This would create a production backlog that would impact other customers as well.  As a result, PSI would experience cash flow restrictions that could lead to layoffs of hundreds of workers, all because the SRIV is blocking the NSMV 4.  In short, PSI would be gravely harmed if the injunction is issued, and it cannot temporarily move the SRIV to release the NSMV 4.

D.    **The Public Interest**

The public interest also weighs in favor of denying the preliminary injunction.  Courts "of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winters*, 555 U.S. at 24.  As Great Lakes has argued, enforcing valid contracts serves the public interest. *LVL Co., LLC*, 469 F. Supp. 3d at 425; *Guardian Life Ins. Co. of Am.*, 446 F. App'x at 457.  However, a greater public interest is served by ensuring the timely delivery of NSMV 4 and NSMV 5, which will be used as training vessels by the state maritime academies and to support disaster response. *See Winters*, 555 U.S. at 25-26 (holding that public interest weighed strongly in favor of allowing U.S. Navy unfettered use of sonar technology during training exercises when weighed against environmental group's interest in preventing harm to marine mammals impacted by sonar use).

IV.    **CONCLUSION**

It is reasonable for Great Lakes to want delivery of the SRIV at the soonest practicable time consistent with the VCA.  It is also reasonable for Great Lakes to have concerns and questions about the tandem float and to seek assurances.  However, it is not reasonable for Great Lakes to block the tandem float under the circumstances presented here.  Great Lakes has not established that the preparations for, and execution of, the tandem float would violate the VCA.  Even if it had, Great Lakes has not established a significant risk that any harm it might suffer as a result would not be adequately compensated by monetary damages.  Moreover, whatever harm Great Lakes might suffer, preventing the tandem float -- and leaving the SRIV blocking the NSMV 4 -- would cause greater harm to PSI and would not serve the public interest.  For the foregoing reasons, Great Lakes' motion for a temporary restraining order and preliminary injunction with respect to the tandem float is denied.

**BY THE COURT:**

_____
MARY KAY COSTELLO, J.